OPINION OF THE COURT
Steven W. Fisher, J.
These motions to suppress present two principal issues. The first is whether a statement by the father of a 19-year-old suspect being taken into custody, informing the police that his son has a lawyer who would immediately be called, constitutes either an invocation of the suspect’s right to counsel or the entry of an attorney into the case. The second is whether a homicide suspect’s otherwise voluntary statement is attenuated *63 from his unlawful arrest when, prior to the statement, another suspect implicates him in the crime.
I
Based upon my evaluation of the evidence offered at the suppression hearing, I make the following findings of fact:
At approximately 11:30 p.m. on August 4, 1994, Kei Sunada, a Japanese exchange student, was shot to death on the 4th floor stairwell of 97-15 Horace Harding Expressway in the Lefrak City Development in Queens. Four days later, detectives investigating the homicide were informed that an individual, arrested on an unrelated robbery, claimed to have information about the crime.
The individual told the detectives that he had overheard a conversation in a local candy store indicating that a person called Junior, who drove a light-colored Oldsmobile with the words "Head Crack” or "Headcrackers” on the front window, was responsible for the homicide. The informant added that Junior had two good friends named Reggie and Kendo.
Apparently recognizing the names, the detectives secured photographs of Reginald Cameron and Kendo MacDonald who were suspected in prior robberies in the building where the homicide occurred. Both were believed to be wanted on pending robbery complaints and, in fact, a wanted poster for Cameron was on display in the security office at Lefrak City.
As it turned out, although 19-year-old Reginald Cameron had been arrested twice before for robbery and had one case still pending, he was not then wanted by any law enforcement agency in connection with any crime. Kendo MacDonald, however, was apparently being sought on an open, unrelated robbery charge, and was then on probation.
In any event, at approximately 3:30 p.m. on August 8, 1994, detectives went to Lefrak City in search of Reginald Cameron, Kendo MacDonald, and the person known as Junior. At first, their efforts were unsuccessful, but when they returned to the area at approximately 7:00 p.m., Detective Joseph Croce spotted Cameron standing with his father and a Lefrak security guard on 57th Avenue.
Croce approached and immediately took Cameron into custody. When Cameron’s father asked the reason for the arrest, Croce told him that his son was suspected in a robbery and would have to stand in a lineup. The father responded that Cameron had an attorney and that he would notify her.
*64 Cameron’s father was referring to Elizabeth Pruser, a staff attorney for the Legal Aid. Society who was representing Cameron on a pending robbery case and who had represented him on an earlier, dismissed robbery charge. At 7:32 p.m., Cameron’s father called Ms. Pruser and left word on her office answering machine that his son had been rearrested.
Meanwhile Detective Croce brought Cameron into the Lefrak security office and placed him in a holding cell. The detective then received a radio transmission that police had located the suspect Oldsmobile that allegedly belonged to Junior. Croce, Detective Alquimides Arroyo, and other officers kept the vehicle under surveillance until four young men approached it. The police stopped them and quickly determined that one of the men was Kendo MacDonald and another was the owner of the vehicle, Armond McCloud, who was known as Junior.
McCloud was frisked without result. When he could not produce papers for the car, he was handcuffed and placed in a police vehicle for transport to the 110th Precinct. MacDonald was also taken into custody. The two other young men were briefly detained and released.
Detectives returned to the security office to retrieve Cameron. As they were walking him to a police vehicle to take him to the precinct, his father approached and repeated that his son had an attorney. He said that he had called her and would do so again. The detectives responded by giving him the precinct’s telephone number and telling him to ask for Detective Gonzalez who was in charge of the case.
Cameron’s father next called McCloud’s mother to tell her of her son’s arrest. He then went to the 110th Precinct but was not permitted to see his son. At 8:54 p.m., he called Ms. Pruser’s number again, this time leaving word on her machine that his son was at the 110th Precinct. He then left for work, calling the precinct periodically throughout the night in an attempt to get additional information about his son.
At the precinct, Cameron, McCloud, and MacDonald were taken to separate areas where they were uncuffed and offered food and drink. Each was told that the police were seeking information regarding the August 4th homicide. Each claimed to have no knowledge of the crime.
Sometime after midnight, Detective Mary Ann Herbert entered the room in which Kendo MacDonald was seated with Detective Ruben Martinez. Detective Herbert began a conversa *65 tion with MacDonald, asking him about his family and his job. He told the detective that he worked as a baggage handler at Kennedy Airport. He also revealed that he was on probation, and he expressed concern that his predicament might affect his probationary status and his participation in a community service program.
The conversation then turned to the homicide, and Detective Herbert advised MacDonald of his constitutional rights. When MacDonald said that he had heard about the incident, the detective asked him whether he had been in the building at the time of the crime. MacDonald stated that he had, and then gave the detective an account of what he had seen, first orally and then in writing.
He said that he had been standing in the lobby of the "Peru” building with Cameron, McCloud, and a young woman when they saw a "light skinned Asian guy” carrying "a bag with pockets” waiting at the elevators in the "Colombia” building. Cameron and McCloud told MacDonald to "chill” and then followed the Asian man into the elevator. A few minutes later, they came running down the stairs. McCloud was tucking a gun into his waistband and said that, as he had been "trying to open the door of the stairs”, he shot "the guy”. MacDonald ran out of the building with them and saw Cameron discard a wallet.
MacDonald said that he spoke with Cameron a few days later and told him that shooting the man had been stupid. Cameron explained that he had gotten the man’s wallet but McCloud believed that the man had more. When McCloud tried to search him, however, the man began fighting. McCloud shot him, and then he and Cameron ran down the stairs.
At approximately 2:15 a.m., Detective Herbert entered the room in which Cameron was seated. Without naming the source of her information, the detective told him what she knew about the circumstances of the homicide. Cameron then agreed to speak with her about the incident.
The detective first advised him of his Miranda rights, reading from a printed form. He expressed his understanding of the rights and his willingness to speak to the detective, and he initialled and signed the Miranda form.
Cameron then made an oral statement, telling Detective Herbert that, after he and Junior entered an elevator in the Colombia building with a "Chinese” man, Junior tried to rob the man and then shot him. Cameron expressed remorse over *66 the shooting but claimed to have had no prior knowledge of the gun or of Junior’s intention to commit the robbery.
Thereafter, Carlos Gonzalez, who was the assigned detective in the case, entered the room. He asked Cameron if he had been given his rights. Cameron said that he had, but Detective Gonzalez administered the rights again, using the same Miranda form. Cameron waived his rights again, and repeated his account orally for Detective Gonzalez. He then agreed to put his statement in writing and did so in the presence of Detectives Herbert and Gonzalez. He also said that he would be willing to make a videotaped statement to the District Attorney. He asked only that he be kept away from McCloud.
Later, at approximately 4:00 a.m., Detective Gonzalez began speaking with McCloud. In the presence of Detective Herbert, he advised him of his constitutional rights, reading from a printed form and recording his answers. McCloud expressed his understanding of the rights and agreed to speak with the detective. He initialled and signed the Miranda form.
Detective Gonzalez then told McCloud that he knew exactly what had happened and that "everybody” was telling him what McCloud had done. He said he understood that it was probably an accident, and he invited McCloud to give his own account. The detective said that he would let McCloud think about it and would return in five minutes.
When Detective Gonzalez reentered the room, McCloud gave him an oral statement, saying that he, Cameron, and MacDonald followed the "Chinese” man into the elevator and tried to rob him in the 4th floor hallway. The man resisted, however, and assumed a fighting stance. When the man threw a karate kick, McCloud’s gun accidently went off and the man was shot. McCloud repeatedly said that he had not meant to shoot the man.
In the presence of both Detectives Gonzalez and Herbert, McCloud reduced his statement to writing. He then signed it, as did the two detectives. McCloud also agreed to give a videotaped statement.
Later that morning, Assistant District Attorney Kim Marcus arrived at the precinct. At 8:05 a.m., she notarized the written statement of Kendo MacDonald who swore to its truth. Thereafter, she took videotaped statements from both Cameron and McCloud, each of whom was again advised of, and waived, Miranda rights.
Sometime between 9:15 a.m. and 9:20 a.m., as Cameron was giving his videotaped statement at the precinct, Elizabeth *67 Pruser arrived at her office and retrieved the messages Cameron’s father had left the night before. She called the precinct, leaving word that she represented Reginald Cameron.
Now indicted for murder and related crimes, both Cameron and McCloud move to suppress their statements.
II
Cameron contends first that his father’s statements to the police were sufficient to invoke the right to counsel and marked the entry of an attorney into the case. He argues that, as a result, his Miranda waivers were ineffective because they were given in the absence of an attorney, and therefore all of his statements — oral, written, and videotaped — must be suppressed.[1]
As a matter of State constitutional law, when a suspect in custody invokes the right to counsel, or when an attorney enters the case on the suspect’s behalf, the police may not thereafter question the suspect, or elicit an effective Miranda waiver, except in the presence of the attorney (see, e.g., People v Cunningham, 49 NY2d 203 [1980] [invocation of right to counsel]; People v Hobson, 39 NY2d 479 [1976] [entry of counsel into the case]). I conclude, however, that the statements of Cameron’s father here neither invoked his son’s right to counsel nor marked the entry of counsel into the case.
There is scant authority in this State or elsewhere for the proposition that the parents of an adult suspect may invoke the right to counsel on behalf of their offspring. Cameron relies principally on People v Lee (155 Misc 2d 337 [Sup Ct, Kings County 1992] [Juviler, J.]), the case that arguably offers the strongest support for his position.
In Lee (supra), the 17-year-old defendant was arrested in his school and charged with robbery. His parents were summoned by the principal who advised them to get a lawyer. At the school, and in the presence of the parents, the arresting detec *68 tives administered the Miranda warnings. Within the hearing of the detectives, the parents told the principal that they would hire a lawyer for their son.
At the precinct, the defendant was questioned by a detective who had not been at the school. He did not re-advise the defendant of his Miranda rights but only reminded him that they were still in effect. The defendant gave a statement to the detective, but the interrogation was interrupted when an attorney retained by the parents called the precinct only two hours after the arrest at the school.
In considering the admissibility of the defendant’s statement, the court recognized that "[traditionally * * * the right to counsel is invoked by the defendant; it is the defendant’s decision, not the parents’, whether a defendant age 16 or older should speak or remain silent” (155 Misc 2d, at 341, supra). Thus, the court acknowledged that "[n]o case has held directly that a parent can invoke a child’s right to counsel if the child is more than 15 years of age” (supra, at 342).
Nevertheless, the court suppressed the statement, finding that "at the very least the police were required either (1) to tell the defendant at the precinct that he had the right not to speak until the arrival of the lawyer whom the parents were seeking to retain, and were required to verify that the defendant understood that, or (2) to wait a reasonable time for a lawyer to come before questioning the defendant” (supra).
Moreover, because the interrogating detective failed to repeat the Miranda warnings at the precinct, the court entertained a reasonable doubt as to whether the defendant had voluntarily, intelligently, and knowingly waived his right to counsel before speaking to the police. And, finally, the court cited as significant factors in its decision that "the young defendant had never been arrested before, he was handcuffed while interrogated, and the detective threatened to pin other robberies on him” (supra, at 343).
To the extent that Lee (supra) can be read as authority for the broad proposition that the parents of an adult suspect may invoke their child’s right to counsel, it stands alone and I respectfully decline to follow it. To the extent that its holding was strictly limited to its facts, the case is plainly distinguishable.
Although both a 17 year old and a 19 year old are treated as adults when charged with a crime (see, Penal Law § 30.00 [1]), the law does draw at least one important distinction between
*69 them. A 17 year old is eligible for youthful offender treatment; a 19 year old is not (see, CPL 720.10 [1]).
Moreover, the defendant in Lee (supra) had no prior conflicts with the law whereas Cameron had twice before been arrested and, in fact, was represented by an attorney in a pending criminal case. And, unlike the defendant in Lee, Cameron was advised of his constitutional rights at the precinct no fewer than three times, he was not interrogated while handcuffed, and he makes no claim that the interrogating detectives ever threatened to lodge unrelated charges against him.
The general rule is that the right to counsel, like most other constitutional rights, is personal to the suspect and may not be invoked on the suspect’s behalf by family members or other third parties (see, e.g., Terry v LeFevre, 862 F2d 409, 412 [2d Cir 1988]; Oquendo v Scully, 1990 WL 88620 [ED NY, June 11, 1990]; Lee v State, 631 So 2d 824, 827 [Miss 1994]; State v Kramar, 149 Wis 2d 767, 440 NW2d 317 [1989]; State v Burbine, 451 A2d 22, 28 [RI 1982]). There is simply no compelling reason in logic or policy to hold that a 19-year-old suspect, experienced with the criminal justice system, represented by an attorney in another pending case, and fully advised of his constitutional rights, should not bear full responsibility for requesting counsel if he deems legal representation necessary or advisable. I hold, therefore, that Cameron’s right to counsel was not invoked by his father’s statements to the police.[2]
Moreover, although those statements were sufficient to alert the detectives that Cameron had counsel on an unrelated matter, such representation, even if known to the police, is no longer the equivalent of the entry of counsel into the new case (see, People v Bing, 76 NY2d 331 [1990], overruling People v Bartolomeo, 53 NY2d 225 [1981]).
Consequently, I hold that nothing the father said to the police on the street affects the admissibility of Cameron’s statements at trial.
III
Both Cameron and McCloud maintain that their statements must be suppressed as the tainted fruit of their unlawful arrests.
*70 Based largely on the testimony of Detective Alquimides Arroyo, the People argue first that McCloud was not in fact arrested but voluntarily agreed to come to the precinct to be questioned about his vehicle away from the crowd that was gathering on the street. I hold, however, that despite any prior indication that he would voluntarily accompany the police to the precinct, once McCloud was frisked, handcuffed, and taken away in a police vehicle, he was under arrest (see, People v Diaz, 131 AD2d 690, 693 [2d Dept 1987], lv denied 70 NY2d 710; see also, People v Brnja, 50 NY2d 366, 372 [1980]; cf., Dunaway v New York, 442 US 200 [1979]).
Moreover, I conclude that both defendants were arrested without probable cause. The only information the police had at the time connecting them to the homicide was a casual rumor, overheard and reported by an individual who was seeking consideration in his own unrelated case. It was therefore plainly insufficient to support the arrest of either defendant (see, e.g., People v Chase, 85 NY2d 493, 501 [1995]; People v Elwell, 50 NY2d 231, 234-235 [1980]; see also, Henry v United States, 361 US 98, 100 [1959]).
But the fact that a defendant is unlawfully arrested does not necessarily require suppression of all subsequent custodial statements. The law recognizes that the chain of causation leading from an illegal arrest to a subsequent custodial statement may become so attenuated as to remove the taint of the initial illegality (see, e.g., Brown v Illinois, 422 US 590 [1975]; People v Rogers, 52 NY2d 527 [1981], cert denied 454 US 898; People v Dyla, 142 AD2d 423, 430 [2d Dept 1988], lv denied 74 NY2d 808; cf., Wong Sun v United States, 371 US 471 [1963]).
In determining whether such attenuation exists, courts generally look to three factors: the temporal proximity of the statement to the arrest; the purpose and flagrancy of the illegal arrest; and the occurrence of any significant events intervening between the arrest and the statement (see, Brown v Illinois, supra, 422 US, at 603-604; see also, People v Martinez, 37 NY2d 662 [1975]).
The defendants here were arrested between 7:00 p.m. and 7:30 p.m. on August 8, 1994. Cameron was advised of his rights and gave his oral and written statements beginning some seven hours later, and McCloud’s statements began approximately two hours after that. Clearly, then, in terms of temporal proximity, the defendants’ statements did not follow close on the heels of their illegal arrests (compare, Brown v Illinois, supra, at 604 [less than two hours between arrest and confession]).
*71 Moreover, although unsupported by probable cause, the arrests here were not calculated to cause "surprise, fright and confusion” (Brown v Illinois, supra, at 605), nor were they knowing or intentional attempts to avoid legal restrictions on questioning (see, People v Harris, 72 NY2d 614, 622 [1988], revd on other grounds 495 US 14 [1990], on remand 77 NY2d 434 [1991]).
Indeed, Cameron was suspected in other robberies committed at the scene of the homicide, and was believed — albeit mistakenly — to be wanted on a pending robbery complaint. McCloud, rumored to be the actual shooter, claimed to be the owner of a suspect vehicle for which he could produce no papers and, according to uncontradicted police testimony, agreed to come to the precinct to clear up the matter. I conclude, therefore, that the defendants’ arrests, while unlawful, did not involve flagrant and purposeful police misconduct (cf., People v Martinez, supra, 37 NY2d, at 669, n 6; Taylor v Alabama, 457 US 687 [1982]).
In any event, the most important factor in attenuation analysis often is the presence or absence of intervening events (see, e.g., People v Beamon, 255 Ill App 3d 63, 67, 627 NE2d 316, 319 [1993]). In essence, there are two types of intervening events relevant to the issue. One relates to the suspect’s state of mind and inclination to speak to the police; the other goes to the lawfulness of the suspect’s continued detention.
As to the first, a suspect’s decision as to whether or not to speak to the police may be greatly influenced by consultation with an attorney (see, e.g., Brown v Illinois, supra, 422 US, at 611 [Powell, J., concurring]), or a spiritual advisor (see, e.g., Dunaway v New York, supra, 442 US, at 220 [Stevens, J., concurring]), or by a desire to avoid seeing someone else falsely accused (see, e.g., Rawlings v Kentucky, 448 US 98, 108-109 [1980]), or, most importantly, by a discovery that the police already have substantial incriminating evidence (see, e.g., People v Rogers, supra, 52 NY2d, at 534). Such factors are considered intervening events significant to attenuation because they affect the suspect’s willingness to speak to the police without being dependent upon the suspect’s detention (see, e.g., State v Tobias, 538 NW2d 843 [Wis App]; People v Thomas, 186 Ill App 3d 782, 794, 542 NE2d 881, 888 [1989], cert denied 495 US 959).
The second type of intervening event occurs when, prior to the statement and in a manner entirely independent of the arrest, the police obtain information sufficient to constitute probable cause. Such an event is considered critical, and often dis- *72 positive, on the question of attenuation (see, e.g., United States v Cherry, 794 F2d 201, 206 [5th Cir 1986], cert denied 479 US 1056). This is so because an unlawful arrest does not confer upon the suspect lifetime immunity from questioning or prosecution (cf., United States v Crews, 445 US 463, 474 [1980]; United States v Friedland, 441 F2d 855 [2d Cir 1971], cert denied 404 US 867; People v Rogers, supra; People v Reisman, 29 NY2d 278 [1971], cert denied 405 US 1041; People v Roman, 214 AD2d 1056 [2d Dept 1995]), and no constitutional interest would be advanced by requiring that, before interrogation, the police release and then rearrest the suspect on the basis of the information freshly obtained (see, e.g., United States v Morris, 451 F Supp 361, 366 [ED NY 1978], remanded 597 F2d 341, affd after remand 614 F2d 1292). Thus, the independent garnering of probable cause before the statement generally breaks the chain of causation and purges the taint of the unlawful arrest.
In the case at bar, prior to eliciting the statements here in issue, the police had independently obtained probable cause for Cameron’s arrest through the information provided by Kendo MacDonald. MacDonald spoke on the basis of personal knowledge and the detectives had reason to consider him reliable both because his account corresponded precisely with what the police already knew about the crime (see, e.g., People v Rodriguez, 52 NY2d 483, 490 [1981]; see, also, People v DiFalco, 80 NY2d 693 [1993]; United States v Canestri, 518 F2d 269, 272 [2d Cir 1975]), and because he was a suspect in the case whose statement implicated his own penal interests and endangered his probationary status (see, e.g., People v Johnson, 66 NY2d 398 [1985]; People v Moses, 214 AD2d 587 [2d Dept 1995]; see also, People v Comforto, 62 NY2d 725, 727 [1984]). And the detectives certainly had probable causé for McCloud’s arrest once they took statements from both MacDonald and Cameron, each of whom confirmed that McCloud was the shooter.
Moreover, even if the information furnished by MacDonald was insufficient to provide probable cause, his statement to the police nevertheless constituted a significant intervening event strongly affecting each defendant’s inclination to speak. Cameron immediately agreed to give a statement to Detective Herbert when she revealed to him what she had come to learn about the crime. Similarly, McCloud chose to give a statement soon after he was confronted with the fact that the police already had detailed information regarding his role in the killing. Thus, MacDonald’s statement to the police implicating the *73 defendants was an intervening event clearly súfficient to dissipate the taint of the unlawful arrests (see, e.g., People v Herner, 212 AD2d 1042 [4th Dept 1995], lv denied 85 NY2d 974; People v Leary, 145 AD2d 732 [3d Dept 1988], lv denied 73 NY2d 1017; People v Matos, 93 AD2d 772 [1st Dept 1983]).
Consequently, I hold that, under the circumstances at bar, the unlawful arrests of the defendants do not require suppression of their statements (see, State v Barry, 86 NJ 80, 429 A2d 581 [1981], cert denied 454 US 1017).
IV
Lastly, the evidence establishes beyond a reasonable doubt that each of the statements at issue here was voluntary in the traditional Fifth Amendment sense, and followed a voluntary, knowing, and intelligent waiver of properly administered Miranda rights. Nevertheless, Cameron’s videotaped interrogation continued beyond the point at which Elizabeth Pruser called the precinct, identified herself as his attorney, and thereby entered the case on his behalf (see, e.g., People v Tompkins, 45 NY2d 748 [1978], cert denied 440 US 939). As a result, that portion of Cameron’s statement made after Ms. Pruser’s call must be excluded from the People’s case-in-chief (see, e.g., People v Rosa, 65 NY2d 380, 384 [1985]).
Pruser testified that she made the call sometime between 9:15 a.m. and 9:20 a.m. Because the defendant bears the burden of proof on the issue of whether and when the right to counsel attached (cf., People v West, 81 NY2d 370, 378-379 [1993]; People v Rosa, supra, at 387), and because no challenge has been made to the time markings on the videotape itself, I hold that all portions of Cameron’s videotaped statement beginning when the time marker reaches 9:20 a.m. and continuing thereafter should be suppressed.
V
Accordingly, defendant Cameron’s motion should be granted in part and denied in part. Those portions of his videotaped statement beginning when the time appearing on the tape reaches 9:20 a.m. and continuing thereafter should be suppressed. In all other respects, his motion should be denied.
Defendant McCloud’s motion should be denied in all respects.

. On the witness stand, Cameron testified that he personally asked for counsel while at the precinct. He claimed to have made that request once, and to have directed it to a male detective whose name he could not recall but who had testified for the People at the hearing. The District Attorney, in rebuttal, recalled each of the male detectives who had testified at the hearing in the People’s case-in-chief. Each denied that Cameron had asked for an attorney in his presence. Cameron chose not to offer anything further with respect to the identity of the detective to whom he allegedly addressed his request for counsel. Based upon that failure, and upon my evaluation of Cameron’s testimony, I reject the assertion that he ever personally asked for an attorney.

. [2] I reject the argument that Cameron personally invoked his right to counsel by giving silent acquiescence to his father’s statements made in his presence. An affirmative indication by Cameron himself was required to invoke the right (see, e.g., State v Stanislaw, 153 Vt 517, 530, 573 A2d 286, 294 [1990]).