■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHELLE LENNON, Appellant. [662 NYS2d 821] —Appeal by the

defendant from a judgment of the County Court, Rockland County (Nelson, J.), rendered May 30, 1995, convicting her of murder in the second degree, upon her plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress statements made by her to law enforcement officials.

Ordered that the judgment is affirmed.

By virtue of her plea of guilty, the defendant was convicted of intentionally killing her husband. At the plea allocution the defendant admitted that she beat her husband in the head with a baseball bat while he lay sleeping on a couch and, with the aid of an accomplice, covered his head with a plastic bag until he stopped breathing.

The testimony elicited at the suppression hearing is comprehensively set forth in the dissent. The facts, as found by the County Court and insofar as they are relevant to the defendant's contention that she was deprived of her right to counsel, are that after the defendant agreed to accompany the police to the police station, an attorney who had represented her in past matters telephoned the station and later appeared at the station, after being contacted by the defendant's father. Upon learning that the attorney was on his way to the station, the detective interviewing the defendant conveyed this to the defendant and inquired as to whether she wanted the attorney to represent her. In response to this inquiry, the defendant indicated that he had represented her in the past, spoke disparagingly of him, and stated in no uncertain terms that if she needed a lawyer to represent her in this case, it would not be him. The defendant agreed to speak to the detectives without an attorney, and ultimately admitted murdering her husband.

Under the law of this State, the right to counsel attaches indelibly in two situations. The first is upon the commencement of formal criminal proceedings (*see, People v Samuels*, 49 NY2d 218; *People v Settles*, 46 NY2d 154; *People v Di Biasi*, 7 NY2d 544). The second is where an uncharged individual has actually retained an attorney in the matter or, while in custody, has requested counsel in that matter (*see, People v West*, 81 NY2d 370, 373-374; *People v Ellis*, 58 NY2d 748; *People v Skinner*, 52 NY2d 24; *People v Cunningham*, 49 NY2d 203, 209; *People v Hobson*, 39 NY2d 479; *People v Arthur*, 22 NY2d 325, 329). In either case, once the right to counsel attaches, it may not be waived by a defendant in the absence of counsel (*see, People v Robles*, 72 NY2d 689, 695; *People v Arthur, supra*).

Here, the County Court correctly concluded that the defendant's right to counsel had not indelibly attached at the time she made the inculpatory statements in question. The defendant neither retained counsel on the matter in question nor requested the assistance of counsel. We are well aware of cases involving attorneys who are retained by the defendant's family, rather than the defendant, in which the right to counsel was held to have indelibly attached as though the defendant herself retained the attorney (*see, e.g., People v Garofolo*, 46 NY2d 592; *People v Pinzon*, 44 NY2d 458). In those cases, however, the defendant was never informed that the attorney had contacted the police or appeared at the station, and it was impliedly assumed that an attorney-client relationship existed with regard to the matter in question, and that the defendant would not have rejected the attorney retained by the family. Here, the defendant made it quite clear that she did not wish to extend her relationship with the attorney to include the matter in question, despite being given the opportunity to have him represent her. The detectives in this case did not interfere with the defendant's relationship with the attorney, and in no way impeded her opportunity to receive the benefit of counsel. The decision to retain counsel rests with the defendant (*see, People v Bing*, 76 NY2d 331, 349; *People v Davis*, 75 NY2d 517, 522-523). For us to conclude at this juncture that the defendant's right to counsel indelibly attached when the attorney "entered the picture" at the request of the defendant's father would be to impose the kind of fictional attorney-client relationship which the Court of Appeals abandoned in *People v Bing* (*supra* [overruling *People v Bartolomeo*, 53 NY2d 225, by holding that representation on a pending matter did not create an indelible right to counsel on a new unrelated matter]). We therefore conclude that cases such as *People v Garofolo* (*supra*) and *People v Pinzon* (*supra*) are distinguishable on their facts, and that under the circumstances of this case, the attorney's appearance in the matter did not cause the defendant's right to counsel to attach indelibly.

We also agree with the County Court's conclusion that the warnings given pursuant to *Miranda v Arizona* (384 US 436) were sufficient. A detective advised the defendant of her rights, including her right to an attorney, before asking her to accompany him to the police station, and asked her at the station whether she recalled being advised of her rights. On both occasions, the defendant acknowledged that she understood her rights. We find no merit to the defendant's contention that the warnings given at her home were insufficient (*see, People v Bartlett*, 191 AD2d 574; *People v Thomches*, 172 AD2d 786;

*People v Evans*, 162 AD2d 702). Moreover, a different detective subsequently administered *Miranda* warnings to the defendant again before she confessed to the murder. The hearing testimony supports the County Court's finding that the defendant's waiver of her rights was knowing, voluntary, and intelligent.

We have considered the defendant's remaining contentions and find them to be without merit. Copertino, J. P., Thompson and Santucci, JJ., concur.

Friedmann, J., dissents and votes to reverse the judgment and order a new trial with the following memorandum. Because the defendant was deprived of, *inter alia*, her right to have retained counsel present during a custodial interrogation, or, in the alternative, her right to waive the right to counsel in her attorney's presence, I would reverse the conviction appealed from, permit the defendant to withdraw her plea of guilty, grant that branch of her motion which was to suppress her illegally-obtained statements, and allow her to proceed to trial.

I

On June 11, 1994, Ramapo police officers discovered the body of Brook Lennon concealed behind a fallen tree in a wooded area near Brick Church Road in the Town of Ramapo in Rockland County. Lennon had been bludgeoned, suffocated by means of a plastic bag, and strangled with a telephone cord.

Lennon was a wealthy man in his fifties who, not long before, had married the defendant, who was in her early twenties. The defendant was an admitted crack cocaine abuser, and was sexually promiscuous, indulging in numerous extramarital affairs with both men and women, flaunting her "biker" boyfriends in the small communities where she resided, and engaging in prostitution. So frequent were his wife's arrests that Lennon kept an attorney on a $10,000 annual retainer to represent her when she found herself in the hands of the police. That attorney was Mr. "J.F." J.F. had not been forced on the defendant by her husband. Rather, J.F. had been the sole attorney used by the defendant's father, Leonard Fintzy, as well as by the defendant herself, over a period of years.

Mr. Fintzy testified at the suppression hearing that at about 10:00 P.M. on Saturday, June 11, 1994, he was visited by Detective Woulfe of the Ramapo Police Department, who told him that Brook Lennon had been murdered and that the police were looking for the defendant to identify his body. Fintzy told the officer, *inter alia*, that his daughter and her husband had recently moved to a new residence at 25 Remsen Street in

nearby Monsey, New York. Worried, Fintzy asked Detective Woulfe to telephone him when the police had found his daughter. After Woulfe left, Fintzy called attorney J.F., who asked to be kept informed.

According to police testimony, at around 6:00 A.M. the following (Sunday) morning, some eight officers arrived to execute a "search warrant" at the premises located at 25 Remsen Street in Monsey. When the defendant's "biker" boyfriend, the codefendant Robert Tomassi, answered the door, he was promptly taken outside, frisked, and conducted to the rear of the building, where he was secured. At least two officers then entered the bungalow with their guns drawn. In the living room, they found the defendant asleep on a sofa, near a coffee table littered with drugs and narcotics paraphernalia. The defendant was awakened and told to get dressed.

Various officers testified at the suppression hearing that at this point, i.e., a few minutes after 6:00 A.M., Detective O'Leary advised the defendant of her *Miranda* rights from memory. Detective Woulfe admitted, however, that his arrest report reflected that the defendant had not been given the *Miranda* warnings until 1:55 P.M., when Detective Mulroe undertook to question her after she had identified her husband's body at the Medical Examiner's Office. However, even if Detective O'Leary did tell the defendant her rights at 6:03 A.M., it was admitted at the suppression hearing that he did not inform her of her right to have a lawyer present during questioning by police.

The record is silent as to what reason the police gave to the defendant for their early Sunday morning intrusion into her bungalow. The officers clearly did not mention her husband's murder, because, according to the testimony, this topic was broached only later at the police station, when the defendant acted surprised at the news of her husband's death and burst into tears.

Clearly, a search warrant was mentioned because numerous police witnesses testified that the defendant asked to see it. However, Detective O'Leary declined to show the defendant the warrant because it was not in his possession; and Detective Woulfe, in whose possession it was, testified that he was too concerned with securing the premises and any occupants in it to take the trouble to display a warrant. Detective Lieutenant Dolan testified somewhat more forthrightly that the officers promised to show the defendant the warrant if she accompanied them to headquarters. Paradoxically, although the defendant demanded several times to see the search warrant— both in the bungalow and later in the patrol car—the officers

testified that she never asked them what they wanted to search her house for. The police admitted that no search of the bungalow was actually undertaken at that time.

The defendant was then "asked" to accompany the officers to the police station, and she allegedly agreed to go. It is not clear what the defendant was told about why her presence was needed at the precinct—although there are intimations in the record that the officers were threatening to arrest her, as they had just arrested Tomassi, for possession of narcotics. However, Detective O'Leary testified that he assured the defendant that she was not under arrest.

Notwithstanding this assurance by Detective O'Leary, it is not only clear from the foregoing summary of events that the defendant was in fact under arrest, but Detective Woulfe, who was in charge of the investigation, conceded at the suppression hearing that he had considered the defendant a suspect in the death of her husband from the very beginning—at least in part because of his familiarity with her peculiar life-style, which had led him to believe that her marriage was probably "unstable". According to him, when he entered her bungalow with his gun drawn it was his intention to take "anybody I found in there * * * in[to] custody". The Assistant District Attorney (ADA) presenting the People's case conceded that "in the final analysis * * * she would [not] have been free to go".

In an interview room at the police station at about 7:00 A.M., the defendant was at last shown the search warrant. After reading what the warrant was for, the defendant asked if her husband were dead. When told that he was, the defendant allegedly burst into tears and asked to be left alone. The officers honored her wish for approximately ten minutes.

At about 7:30 A.M., the officers returned, and Detective O'Leary asked her if she remembered her rights, to which the defendant purportedly said yes. However, the defendant was somewhat incoherent, and at length she indicated that she needed to sleep. The officers took her into an administrative section of the station house, where they left her on a couch, having supplied her with a pillow and a blanket. The time was 8:00 A.M.

At about 9:00 A.M., the defendant's father called the station and spoke with Detective Woulfe. Woulfe assured Fintzy that the defendant was not under arrest and discouraged him from coming to the precinct to see her, claiming that she had been up all night helping the police, so that they were going to let her sleep until noon.

Fintzy testified that soon afterwards he telephoned attorney

J.F. to tell him that he was "uncomfortable" with his conversation with Detective Woulfe, and that he would like J.F. to go to the police station "to represent Michelle and to protect her interests".

J.F. testified that this was not the first time that he had been summoned by Fintzy to represent his daughter. After speaking with Fintzy on the telephone at some time between 9:00 and 9:30 on the morning of Sunday, June 12, 1994, J.F. called the Ramapo police station and asked to speak with Detective Woulfe. Because the precinct routinely recorded incoming calls, at least until the caller was connected with a detective, a recording of J.F.'s conversation with the precinct dispatcher was played at the hearing, and a transcript of its contents appears in the record. The call was logged in at 9:47 A.M. J.F. identified himself as an attorney, related that he had been called on behalf of Michelle Lennon, who "is at the station in connection with a homicide", and asked to speak with Detective Woulfe. When Woulfe did not answer the dispatcher's page, the call went out for any detective. Detective Graham answered the call, and the dispatcher informed him: "I have Michelle Lennon's attorney on the line". J.F.'s call terminated at 9:57 A.M.

According to J.F., he told Graham (who he thought was Woulfe), *inter alia*, that he was the defendant's attorney; that he represented the defendant on pending criminal matters; that he had been called by the defendant's father; that he was on his way to the police station to talk to his client; and that the police were not to speak with her until he arrived. Upon asking if the defendant had been charged with anything, J.F. was told that she had not.

Detective Graham, on the other hand, testified that when he took J.F.'s call on behalf of the busy supervising Detective Woulfe, the attorney merely told him that he had been contacted by the defendant's parents, that he had represented the defendant on "past cases", and that "maybe" he "might" come down to the police station, "I guess". Graham denied that J.F. had mentioned that he represented the defendant on pending cases, that he was her attorney on this case, or that all questioning of the defendant should stop until he arrived.

Graham wrote on a yellow Post-It, "Attorney [J.F.], on his way to station to speak to Michelle", and handed it to Detective O'Leary, who read it and passed it on to Detective Woulfe. Allegedly, none of the officers uttered a word as this note was being circulated. According to one version, Woulfe and O'Leary were questioning the defendant at the time they received the

Post-It from Graham. Notwithstanding this, however, all of the officers testified that the defendant was only awakened and questioning resumed at 10:00 A.M., or some three minutes after the call from J.F. ended. The Post-It note was lost, and was not produced at the hearing.

Thereafter, Detectives Woulfe and O'Leary testified that they told the defendant that J.F. was on his way. Did she want to see him, speak to him, have him represent her? The defendant, according to the police account, responded by unleashing a tirade of invective against J.F., in the course of which she declared that despite his representation of her on "past" matters, the attorney was a "pansy ass" whom she could not stand, and whose services she adamantly rejected. Although the officers had "waiver of attorney" forms on hand, they did not give one to the defendant to sign.

J.F. testified that he put on a suit and arrived at the precinct at about 10:30 A.M. When he asked to see the defendant, the desk officer disappeared into the back. At about 10:45, Detective O'Leary appeared in the doorway to the interior recesses of the precinct and announced to J.F. that the defendant did not want to speak to him. J.F. expostulated that he had made the trip to the station house to talk to the defendant, but O'Leary repeated, "She doesn't want to talk to you", and went back inside, closing the door behind him.

Detective O'Leary's testimony regarding his encounter with J.F. essentially corroborated the attorney's account. O'Leary admitted standing in the doorway between the interior of the station house and the external squad area, blocking the attorney's path. According to O'Leary, he announced to J.F. that the defendant did not want to see him, talk to him, or have him represent her. In O'Leary's version, J.F. merely looked relieved, shrugged his shoulders, said "Okay", and left.

After J.F. departed, the police continued to question the defendant until, at about 5:45-5:50 P.M., she confessed to murdering her husband with the help of her "biker" boyfriend.

At the suppression hearing (the defendant exercised her constitutional right to remain silent and did not testify [*see, e.g., People v Plevy*, 52 NY2d 58]), additional relevant testimony was adduced from the defendant's father and J.F. to the effect that the defendant had never before expressed negative feelings about her attorney or rejected his help or representation. Indeed, the defendant's father testified that his daughter had always found J.F. to be congenial and easy to work with.

Finally, criminal defense attorney Lawrence Weissmann testified that some two weeks before the murder, he was as-

signed by the Public Defender's Office to cover the Clarkstown Justice Court. The defendant was brought in, without an attorney, on a charge of either prostitution or violation of probation. When Weissmann offered to represent her, the defendant declined, saying that J.F. was her lawyer, that he was on his way, and that when he arrived "[e]verything will be fine".

## II

In our system of justice, the right to counsel is so fundamental that the law has created various safeguards to ensure its protection. These include, *inter alia*, the *Miranda* warnings and the rule that counsel who has declared that he represents a suspect in custody cannot be rejected by his client unless he is in her presence. These two safeguards were conspicuously breached in the instant case.

"[T]he fundamental rule in this State is that, once the police have been apprised that a lawyer has undertaken to represent a defendant in custody in connection with criminal charges under investigation, the person so held may not validly waive the assistance of counsel except in the presence of the lawyer" (*People v Garofolo*, 46 NY2d 592, 599; *People v Hobson*, 39 NY2d 479, 481; *People v Arthur*, 22 NY2d 325, 329). The purpose of this rule is self-evident: to prevent the police from isolating a potentially innocent suspect and grilling her until, without the protection of counsel, she is maneuvered into confessing. As Detective O'Leary frankly conceded at the suppression hearing at bar, he preferred that " 'J.F.' not see Ms. Lennon". Moreover, retained counsel must be present when his services are being waived for the simple reason that otherwise the police could invariably represent that the suspect has elected to confess without benefit of counsel—even as counsel is beating at the station house door.

"Once an attorney has appeared on the defendant's behalf we have refused to allow the police to rely on arguable ambiguities in the attorney-client relationship in order to justify police questioning of the defendant without the attorney being present * * * We have indicated that if the police are uncertain as to the scope of the attorney's representation, the defendant should not be questioned * * *

"The important factor in these cases [is] the police awareness of an attorney's appearance on the defendant's behalf, rather than the precise terms of the retainer or appointment" (*People v Marrero*, 51 NY2d 56, 59).

Thus, where an attorney for a defendant then in police custody telephones police headquarters, identifies himself or

herself, asks to speak to the defendant, and requests that there be no more questioning of his client until he or she arrives, the police are on notice that a lawyer has appeared in the case, and must cease questioning the defendant until counsel is present (*see, e.g., People v Pinzon*, 44 NY2d 458; *People v Coleman*, 42 NY2d 500). In the instant matter, there is no question that the defendant was in custody, as this fact was conceded at the hearing both by supervising Detective Woulfe, and by the ADA presenting the People's case.

Where there is any doubt as to whether an attorney has entered the proceedings on a defendant's behalf, "the burden should rest squarely on [the State] to insure that the defendant's right to be represented by counsel be protected. The ambiguity of the lawyer's statement or the manner in which the defendant's attorney went about representing his client cannot be seized by [State officials] as a license to play fast and loose with this precious right. A defendant's right to counsel cannot be made to depend on whether in the sole judgment of the [police] there has been sufficient activity and conduct of a proper character so as to compel a conclusion that the lawyer has entered the proceedings" (*People v Ramos*, 40 NY2d 610, 618; *see also, People v Marrero, supra*).

Here, J.F. telephoned the police station, declared that he represented the defendant on other matters, and informed Detective Graham that he was on his way to headquarters to speak with her. Contrary to Detective Graham's assumption, J.F. was not obliged to announce that he represented the defendant in the matter of her husband's homicide because, so far as the attorney had been advised, his client had not been charged with any such crime. Moreover, because Detectives Woulfe, Graham, and O'Leary all testified that Graham's Post-It was passed around without explanation, it would appear on its face that Woulfe and O'Leary should have concluded that J.F. was on his way to represent his client on the matter that they were currently investigating—particularly where J.F. had informed the police that he had been sent by the defendant's father, who Detective Woulfe had reason to know was worried about his daughter. Finally, the identity of J.F. was not a mystery to the precinct dispatcher, who announced to Detective Graham: "I have Michelle Lennon's attorney on the line".

Contrary to the majority's suggestion, this is not a case of a derivative right to counsel. Concededly, a defendant who has been represented by an attorney solely on past matters can waive her right to have counsel present while being questioned

on new, unrelated charges (*cf., e.g., People v Bing*, 76 NY2d 331; *People v Decan*, 206 AD2d 489; *People v Cameron*, 167 Misc 2d 61). Here, however, retained counsel of long standing actually entered the case on his client's behalf at her father's request, but was refused access to her while the police questioned her regarding her complicity in her husband's murder, without, *inter alia*, advising her that she had the right to have counsel present during her custodial interrogation (*see, e.g., People v Hutchinson*, 59 NY2d 923; *People v Gomez*, 192 AD2d 549, 550). It is no excuse under these circumstances that the defendant allegedly rejected the services of J.F., since after the attorney's telephone call to the station house the police were divested of authority to ask her whether or not she wanted J.F. to represent her—until, that is, J.F. and the defendant were face-to-face.

Because the defendant's confession was obtained in flagrant violation of, *inter alia*, her fundamental right to have counsel present during a custodial interrogation, I would reverse the judgment of conviction and allow the defendant to proceed to a trial at which her illegally-obtained statements should be suppressed.