OPINION OF THE COURT
Laura A. Ward, J.
Pursuant to a decision by Justice Charles Solomon, dated March 4, 2008, this court conducted a Huntley /Dunaway / Rodriguez hearing[1] on September 11, 2008. The Huntley aspect of the hearing related to five statements noticed in the voluntary disclosure form.[2] The Rodriguez aspect of the hearing related to three “confirmatory photo” identifications noticed in the voluntary disclosure form. Following the hearing the parties submitted briefs.
Two witness, Detectives Daniel Hull and Antonio Rivera were called to testify at the hearing. Detective Hull is an 11-year veteran of the New York City Police Department. (Transcript of hearing [tr] at 4.) He was promoted to detective in January of 2008. (Tr at 4-5.) Detective Rivera is a 24-year veteran of the New York City Police Department. (Tr at 75.) Both detectives testified credibly.
The testimony revealed that on October 2, 2007, at approximately 9:30 a.m., Detective Hull was called to 131st Street and 7th Avenue in New York County. (Tr at 6.) When he arrived, Detective Hull saw police and ambulance personnel. (Tr at 6-7.) He observed a body, later identified as Candell Robin *250 son, lying on the floor. (Tr at 8-9.) There were bullet holes in Mr. Robinson’s chest. (Tr at 8.) Detective Hull also saw dice at the scene. (Tr at 91, 97.) Detective Wenzel approached Detective Hull and told Detective Hull that he was in the area when he heard shots fired. (Tr at 10.) Immediately after hearing the shots, Detective Wenzel saw Terrell Rice running from the area with his hand in his waistband and enter 200 West 131st Street. (Tr at 10, 98-99.) Detective Wenzel also told Detective Hull that someone said that T Mack[3] had shot Robinson. (Tr at 99.)
Based upon Detective Wenzel’s statement, Detective Hull proceeded to Rice’s home, 200 West 131st Street, apartment 10G. (Id.) There was no response to Detective Hull’s knocks on the door of apartment 10G. (Id.) Detective Hull contacted the detective squad at the 32nd Precinct to have a photograph of Rice generated to be used by officers who were canvassing 200 West 131st Street looking for Rice. (Tr at 10-11, 77, 102.)
While canvassing the building, a police officer found a 9 millimeter gun on a hook inside the incinerator on the seventh floor of the building. (Tr at 13, 102.) When an officer arrived on the second floor of the building, he showed the resident of apartment 2H the photograph of Rice. (Tr at 14.) The resident told the officer that the man, who he knew as “T,” had entered his apartment, said the police were looking for him and kicked the resident out of his apartment. (Tr at 14-15, 78.)
Police officers from the Emergency Service Unit (ESU) were called to the building. (Tr at 15.) ESU observed Rice through the peephole to apartment 2H. (Tr at 16.) He was pacing back and forth. (Id.) The police tried to speak to Rice by calling the telephone in apartment 2H, but Rice did not answer the telephone. (Id.) At approximately 2:30 p.m., with the permission of the resident of apartment 2H, ESU entered apartment 2H and arrested Rice. (Tr. at 16-17.) Rice was handcuffed and escorted out of apartment 2H. (Tr at 80.) He was turned over to Detective Rivera who testified that when he grabbed Rice to transport him back to the precinct, Rice said “I didn’t shoot nobody. Why you hunting me down? You can check my hands for residue.” (Tr at 81.) Detective Rivera testified that Rice made these statements spontaneously. Rice was not questioned or threatened, nor was he given his Miranda rights. Rice was, however, handcuffed and under arrest. (Tr at 81-82.)
*251 Rice was placed in a patrol car and taken to an interview room at the 32nd Precinct. (Tr at 17, 82.) He was not questioned while being transported to the precinct. (Tr at 19.)
Once back at the 32nd Precinct, around 3:00 p.m., Detectives Hull and Walla joined Rice in the interview room. (Tr at 17, 111.) Over the course of the next 15, 20, 25 or 30 minutes, both detectives spoke to Rice. (Tr at 26, 113-114.) They asked questions to obtain pedigree information and laid out the facts of the case as they understood those facts to be. (Tr at 19-22, 121-123.) The detectives also asked Rice if he had been at the scene and if he was playing dice. (Tr at 124.) Rice did not respond to either question. (Id.)
Rice was informed that Detective Wenzel placed him at the scene of the shooting, that they found the gun and would be able to match it to the bullets and casings found at the scene and that a witness said Rice had pushed his way into apartment 2H after telling the witness the police were looking for him. (Tr at 19-21.) The detectives explained how this situation was going from here. (Tr at 21.) They explained that they “had a witness, usually a lineup would be conducted depending on how the investigation goes.” (Tr at 21-22.) The detectives also told Rice that DNA technology was available and that they could get prints off the gun found at 200 West 131st Street. (Tr at 131.) The detectives told Rice words to the effect of, “The only person who can explain . . . why something like this happens is the person who did the shooting.” (Tr at 138.) Although no threats were made and the detectives testified they only asked pedigree questions and were not confrontational, their conversation elicited a response. Rice began to cry. (Tr at 139.) At approximately 3:25 p.m., Rice said “I didn’t mean to kill him. I just meant to shoot him.” (Tr at 23.)
Immediately thereafter, “Detective Walla produced the Miranda sheets” and proceeded to give Rice his Miranda warnings. (Tr at 23-24, 31-34, 111-112.) Rice appeared to understand the warnings, indicated he was willing to speak with the detectives without counsel and signed the Miranda warnings paper. (Tr at 24, 26, 34-35.) The defendant then described what happened. The defendant cried and confessed to the shooting. (Tr at 140.) He stated, in part, that in response to Candell Robinson “dising” him and his family he went home and got a gun. He returned and, only meaning to scare Robinson, shot him seven times. Rice also said in response to a question about other shots fired that “[m]y boys got my back. Those shots were in the air,” *252 referring to the fact that there were people positioned on the roof to protect Rice when he returned to confront Robinson. (Tr at 38-40.)
Rice talked for approximately one-half hour. (Tr at 35.) After Rice completed making his statement, Detectives Hull and Walla asked him to repeat his statement so that they could write it down. (Tr at 36.)[4] Detective Walla began writing the statement at 4:00 p.m. (Tr at 39.) It took approximately 45 minutes for the statement to be reduced to writing. (Tr at 39.) After the statement was written, Rice was shown “the pad and [asked if he] would like it read back. . . . [He] said T watched you write it and I heard it. I am good with it.’ ” (Tr at 36.) Once that statement was read back to Rice, and certain changes made, Rice signed it. (Tr at 36-38; exhibit 2.)
It was now approximately 4:45 p.m. Detectives Hull and Walla left the interview room. (Tr at 41.) Detective Hull observed Detective Lopez on the telephone. At approximately 4:56 p.m., Detective Lopez handed Detective Hull “a note stating that Terrell Rice’s mom had called and stated that she has an attorney for her son.” (Tr at 41-42.) Mrs. Rice did not give the detective the lawyer’s name. (Id.)
At 5:05 p.m., Detective Hull received a telephone call from “Mr. Garcia . . . [who] stated that he had been hired by Mrs. Rice to represent her son . . . and he want[ed] to come to the precinct to speak with him.” (Tr at 44-45, 140.) Mr. Garcia gave Detective Hull his cell phone number and told the detective that “he was going to represent [Rice].” (Tr at 46.)
Detective Hull returned to speak with Rice at 5:20 p.m., to ask him if he had seen the victim with a gun on the day of the shooting. (Tr at 47-48, 141-142.) After speaking with Rice, Detective Hull memorialized his statement. (Tr at 48.)[5]
Mr. Garcia and some of his colleagues arrived at the precinct around 5:20 p.m. (Tr at 50.) Assistant District Attorney (ADA) Che Arguello went downstairs to speak with Mr. Garcia. (Id.)
Rice was asked if he would agree to speak with an ADA about the shooting and have the statement recorded on video. Rice *253 agreed. (Tr at 50-51.) He was offered “drink, food, cigarettes, bathroom,” prior to the filming of the video, which Rice refused. (Tr at 54.)
At approximately 6:30 p.m., ADAs Julie Nobel and Arguello joined Detective Hull and Rice in the interview room. (Tr at 50-51.) What occurred next was recorded on videotape. (Exhibit 6.) ADA Nobel told Rice that his mother had hired an attorney for him and that the attorney was downstairs. She asked Rice if he wished to speak with the attorney. Rice responded “I want to speak with you first ... I gotta speak to them after.” Thereafter, ADA Nobel gave Rice his Miranda warnings again. Rice appeared to understand his rights and said he did not want to speak to an attorney now. Rice proceeded to make a full confession. (Exhibit 6.)
Detective Hull continued to investigate the shooting. He returned to 200 West 131st Street and spoke with a man on the third floor of the building. (Tr at 56.) On the day of the shooting the man had been shown a photograph of Rice. (Id.) Detective Hull asked the man if he knew Rice. (Tr at 57.) The man said “that he [the man] goes out to the store every day, as he goes out to the store he would see the subject in front of the building.” (Tr at 58.) Thus, the man would see Rice on a daily basis over the years. (Id.) The man did not know the defendant by name or nickname. (Id.)
Detective Hull also attempted to speak with a woman who lived in the building and had identified the photograph of Rice on the day of the shooting. (Id.) Detective Hull was unable to locate the woman, but he did speak again to Kenny, the man in the second floor apartment where Rice was arrested. (Id.) Kenny was shown the photograph and identified Rice as “T.” (Tr at 9.) Rice was known in the neighborhood as “T Mack.” (Id.)
The photographs were used for the purpose of locating the defendant, not to confirm the defendant’s identity as the person who committed the crime. In People v Collins (60 NY2d 214, 219 [1983]), the Court of Appeals, discussing the need for the People to serve identification notice on the defendant, stated that the “primary purpose of the notice requirement is to implement the constitutional guarantees by alerting the defendant to the possibility that evidence identifying him as the person who committed the crime may be constitutionally tainted and subject to a motion to suppress” and that “[t]he existing identification procedures were designed for cases involving ‘eyewitnesses’ or persons who actually witnessed the crime as a victim or by *254 stander.” There is no allegation that the people who identified the person in the photograph as the defendant witnessed the crime or identified him as the person who committed the crime. They identified the defendant as the person who had come to their doors seeking entry into their apartments. Therefore, the identifications made of the defendant during the canvassing of the building, through the use of the defendant’s photograph, do not require that the identifications be suppressed.
A person may be arrested when there is probable cause to believe that the person committed a crime. (CPL 140.10 [1] [b].) Probable cause “ ‘does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been . . . committed’ by the person arrested.” (People v Shulman, 6 NY3d 1, 25 [2005] [citation omitted].) At the time the defendant was removed from apartment 2H of 200 West 131st Street, the police had probable cause to arrest the defendant. Detective Wenzel was in the area when the shots were fired and heard the shots. He immediately saw the defendant, with whom he was familiar, running from the area where the shots were fired with his hand in his waistband. Detective Wenzel saw the defendant enter 200 West 131st Street. In addition to relating this information to Detective Hull, Detective Wenzel told Detective Hull that he, Wenzel, had been told that T Mack had shot the victim. Detectives Hull and Wenzel then went to apartment 10G in 200 West 131st Street, the apartment that was known to Detective Wenzel as the defendant’s apartment, and received no response when they knocked on the door. Detective Hull placed a call to the 32nd Precinct to have a copy of the defendant’s picture generated. While canvassing 200 West 131st Street, a police officer found a 9 millimeter gun on a hook inside the incinerator on the seventh floor. On the second floor of the building a police officer showed the defendant’s picture to the resident of apartment 2H who told the police officer that the defendant had entered apartment 2H, told him that the police were looking for him and then kicked the resident out of the apartment. The defendant was eventually removed from the apartment. The defendant’s flight from the scene, with his hand in his waistband, coupled with his running into his apartment building where he is identified as kicking a resident out of the resident’s apartment because the police were looking for the defendant and the recovery of the gun, clearly establish probable cause for the arrest of the defendant.
*255 A person who is in custody may not be interrogated until he or she has been advised of his or her constitutional rights as set forth in Miranda v Arizona (384 US 436 [1966]), and has waived those rights. Among the rights are the right to remain silent and the right to assistance of counsel. Any statements made as the result of custodial interrogation without the suspect being advised of his rights, and validly waiving those rights, must be suppressed. There are situations when statements made by a defendant must be suppressed where the defendant has not been technically interrogated and made statements without being advised of and waiving his rights. Among those situations is when the police engage in the “functional equivalent” of interrogation, without advising the defendant of his rights and the defendant validly waiving those rights. (People v Ferro, 63 NY2d 316, 322 [1984].) The test for determining whether actions by the police are the “functional equivalent” of interrogation is whether “an objective observer would conclude that the conduct of the detectives was reasonably likely to elicit a response from defendant.” (People v Ferro at 321.)
The first statement made by the defendant, “I didn’t shoot nobody. Why you hunting me down? You can check my hands for residue,” was not preceded by any questions from the detectives or any conduct likely to elicit a statement by the defendant. The statement was clearly spontaneous and therefore not subject to suppression. (People v Huffman, 61 NY2d 795 [1984].)
The admissibility of the defendant’s second statement, “I didn’t mean to kill him. I just meant to shoot him,” hinges on whether the statement was spontaneous or the product of the functional equivalent of interrogation. This statement was preceded by the detectives recounting the evidence found at the scene, including the facts that Detective Wenzel was able to place the defendant at the scene of the shooting and that they had a witness that said the defendant had pushed his way into apartment 2H after telling the witness the police were looking for him. The detectives also told the defendant that they found the gun, that technology would make it possible to get prints off the gun and that the bullets and shell casings found at the scene matched the gun. Additionally, the detectives told the defendant that there was a witness who could possibly view a lineup and that only the person responsible for the shooting could explain what happened. At no point prior to this “recitation of facts” did the detectives inform the defendant of the rights he had pursuant to Miranda v Arizona (supra). It is clear *256 that while no questions were asked of the defendant, the purpose of relating all these facts to the defendant was not to educate him about the case but rather to provoke the defendant into saying something about his involvement in the shooting. Thus, the defendant’s second statement was preceded by the functional equivalent of interrogation, and must be suppressed.
The detectives’ attempt to sanitize the defendant’s unMirandized confession, by informing the defendant of the rights he had pursuant to Miranda v Arizona (supra), and getting the defendant to waive those rights, failed. In People v Chapple (38 NY2d 112, 115 [1975]), the Court of Appeals, in discussing Mirandized statements made following a statement made as a result of constitutional violations, held that
“[w]arnings, to be effective . . . , must precede the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning.”
The Court found that the defendant “was subjected to such a continuous interrogation that the Miranda warnings administered at the site of the burglary were insufficient to protect his rights.” (Id.) In People v Paulman (5 NY3d 122, 130-131 [2005]), the Court stated that
“[t]o determine whether there is a ‘single continuous chain of events’ under Chappie, New York courts have considered a number of factors, including the time differential between the Miranda violation and the subsequent admission; whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning; and whether, prior to the Miranda violation, defendant had indicated a willingness to speak to police. No one factor is determinative and each case must be viewed on its unique facts. The purpose of the inquiry is to assess where there was a sufficiently ‘definite, pronounced break in the interrogation’ to dissipate the taint from the Miranda violation.”
The defendant’s next two statements, the oral statement and the subsequent written version, were clearly part of a “single continuous chain of events” which began with the detectives *257 provoking the defendant into making the un-Mirandized statement. While the defendant was informed of his Miranda rights and waived them, the oral and written statements were made immediately following the defendant’s un-Mirandized statement. The detectives involved in eliciting all the statements were the same, the statements were made in the same location and were made immediately following one-half hour of “interrogation.” Under these circumstances the oral and written statements made following the administering of the Miranda warnings were tainted by the prior actions of the detectives and nothing occurred to attenuate these statements from the detectives’ prior actions and must therefore be suppressed.
The statement that raises a crucial issue is the statement made in response to Detective Hull asking the defendant if he had seen the victim with a gun on the day of the shooting. As noted above, the People do not intend to offer into evidence the defendant’s statement that “[w]hen I am in front of the building talking I don’t see ‘Dell’ with a gun but I think that he has one. Because he leaves and then returns.” The reason for the significance of this statement is that it raises an issue that could affect the admissibility of the defendant’s videotaped confession.
Once a lawyer who is retained to represent an accused individual enters the matter under investigation, the right to counsel has indelibly attached and all questioning of the accused must cease and may not resume unless the accused has waived the right to counsel in the presence of that counsel. (People v Hobson, 39 NY2d 479, 484 [1976].) In People v Arthur (22 NY2d 325, 329 [1968]), the Court held that “once the police know or have been apprised of the fact that the defendant is represented by counsel or that an attorney has communicated with the police for the purpose of representing the defendant, the accused’s right to counsel attaches.” The Court also held that the existence of a formal retainer is immaterial. The communication to the police by counsel that he is representing the accused may occur by way of a phone call to the police agency in whose custody the defendant is being held. (People v Pinzon, 44 NY2d 458 [1978].) In People v Grice (100 NY2d 318 [2003]), the Court held that communication by a family member that counsel was on the way to the precinct to represent the accused was insufficient for the right to counsel to attach. The requirement therefore is that the right to counsel attaches when counsel for the defendant, or a member of counsel’s office, notifies the police of counsel’s representation of the accused.
*258 In People v Lennon (243 AD2d 495 [2d Dept 1997], lv dismissed 91 NY2d 942 [1998]), an attorney, after being contacted by the defendant’s father, notified the police by telephone that he was representing the accused. The police, prior to questioning the defendant, notified the defendant of counsel’s representation of her and she rejected him as her attorney. The Appellate Division held that the right to counsel did not attach because the accused, upon being informed that counsel had appeared on her behalf, rejected counsel’s representation of her. The Appellate Division distinguished those cases where the right to counsel attached upon the mere notification to the police, by counsel, that counsel represented the accused. The Appellate Division noted that in those cases “the defendant was never informed that the attorney had contacted the police or appeared at the station, and it was impliedly assumed that an attorney-client relationship existed with regard to the matter in question, and that the defendant would not have rejected the attorney retained by the family.” (Id. at 497.) The Appellate Division, noting that the right to counsel is a personal right, concluded that the defendant has the right to reject counsel retained by a third party.
In People v Lennon (supra), the defendant was informed of counsel’s representation of her and, prior to the commencement of any questioning, she rejected counsel’s representation. Therefore, the rule that questioning must cease upon counsel’s entry into the matter under investigation has not been affected by the decision in Lennon, unless the accused has been informed of counsel’s representation and has rejected that representation prior to the commencement of or continuation of questioning.
In this case, Detective Hull was notified at 5:05 p.m. that the defendant was being represented by counsel. Pursuant to People v Lennon (supra), Detective Hull could have continued to question the defendant if he had notified the defendant that counsel had entered the case and the defendant then notified Detective Hull that he did not want to be represented by counsel. However, after being notified that the defendant was represented by counsel, Detective Hull, at 5:20 p.m. returned to the defendant and, without informing the defendant that counsel was representing him, questioned him further about the case. Therefore, the defendant was not given the opportunity to reject counsel obtained by his mother and, as stated in People v Lennon, “the defendant was never informed that the attorney had contacted the police or appeared at the station, and it was *259 impliedly assumed that an attorney-client relationship existed with regard to the matter in question, and that the defendant would not have rejected the attorney retained by the family.’’(Id. at 497.) Thus, even under Lennon, the right to counsel had attached and no further questioning of the defendant was permissible unless the defendant waived counsel in the presence of counsel. This never occurred.
Therefore, not only is the statement made by the defendant at 5:20 p.m. inadmissable since it was elicited in violation of the defendant’s right to counsel, so too is the defendant’s videotaped statement. While the defendant was informed that there were attorneys present in the precinct and was given the opportunity to consult with those attorneys prior to making any further statements, his decision, in the absence of counsel, to make the videotaped statement without speaking to counsel was an ineffective waiver of the right to counsel that had attached at 5:20 p.m. Thus, the videotaped statement is inadmissable.
Based upon the foregoing, the defendant’s motions to suppress the photographic identifications and the defendant’s statement made at 200 West 131st Street are denied. The defendant’s motion made to suppress all the statements made at the 32nd Precinct is granted.

. The Rodriguez hearing was to be followed by a “Wade hearing if the hearing court finds that no prior relationship existed between the identifying witnesses and the defendant.” (Mar. 4, 2008 decision at 2.) This court found it unnecessary to conduct a Wade hearing.

. The People withdrew statement notice No. 5 of a written statement made on October 3, 2007 at 5:20 P.M.

. Terrell Rice is also known, in the community, as T Mack. (Tr at 9.)

. When Rice was asked to write down his statement, “he said he was willing to give a written statement but preferred that one of us [detectives] wrote it down.” (Tr at 36.)

. The People withdrew the statement notice with regard to Rice’s response to the detective’s question about a gun. The statement read, “When I am in front of the building talking I don’t see ‘Dell’ with a gun but I think that he has one. Because he leaves and then returns.” (Voluntary disclosure form at 2, statement 5.)