*338 OPINION OF THE COURT
Michael R. Juviler, J.
THE ISSUES
This is a written version of an oral decision after a hearing on a motion to suppress a confession to two robberies; these crimes are alleged in separate indictments. The main issue is the factual and legal significance of the statement of the 17-year-old defendant’s parents at the time of his arrest — before he confessed — that they were going to get him a lawyer.
The People have the burden to prove the voluntariness of the statement beyond a reasonable doubt.
FINDINGS OF FACT
On the credible evidence as I find it to be after resolving conflicts in testimony, I make the following findings of fact.
On March 30, 1990, four Asian men committed a robbery at the Kar Chinese Restaurant on Avenue X in Brooklyn. Six months later, on September 21, 1990, another armed robbery was committed at the same restaurant by two Asian men.
Three months later, on March 16, 1991, another Chinese restaurant in Brooklyn, the Peking Kitchen, was robbed by two Asian men. That robbery was partially captured on tape by a security video system. Detectives investigating that robbery examined the video and made still photographs from it. Having investigated a number of similar robberies of Chinese restaurants in Brooklyn by Asian robbers, they believed that they recognized one of the perpetrators in the photographs and on the video as Quy Lam.
Three weeks after that robbery, on the morning of April 10, 1991, Detectives Salzo and Miller arrested Quy Lam for that crime. Lam confessed. He identified Steven Lee, the defendant here, as the other person depicted in the photographs. He said that Lee was a senior at New Utrecht High School. Lam also confessed that he and Lee and a person named Wu had robbed the Kar Restaurant.
Later that morning, April 10, Detective Miller and Sergeant Moore, who had been supervising the investigation of the robberies of Chinese restaurants, went to New Utrecht High School to arrest the defendant Steven Lee. They arrived there at 11:00 a.m.
The defendant was then 17 years old, six weeks short of 18. He lived with his parents. He had never been arrested. He *339 was fluent in English and Chinese. The principal of the school, Mr. Leibowitz, described him at the hearing as a fairly good student who could do better; the obvious inference, which I adopt, is that the defendant was an intelligent person who was not performing in school up to his ability.
Mr. Leibowitz got the defendant from his classroom and made sure that the defendant’s parents came to the school before the detectives had any significant contact with him. He advised the defendant, outside the hearing of the detectives, not to answer questions but to wait for his parents. Shortly, the parents arrived with another relative. An interpreter was summoned from the staff of the school. The principal told the parents in the defendant’s and the detectives’ presence that Steven had the right to a lawyer and that the parents should advise Steven not to say anything.
Detective Miller, in the presence of the parents and the principal, read the complete Miranda warnings to the defendant. This included his right to counsel, his right to consult with a lawyer before speaking to the police, and his right to remain silent until he had an opportunity to consult with a lawyer. The defendant and his father acknowledged at the hearing that they understood these rights and the other Miranda rights.
After the Miranda rights were given, and as the defendant and the principal were walking out of the school with the detectives and the defendant’s parents, the principal told the parents to make sure that they got a lawyer. The parents replied that they would get a lawyer. The defendant and the detectives heard this exchange. It was made clear to the detectives that while they were taking the defendant to the police station the parents would be looking for a lawyer to join the defendant at the precinct. One of the detectives gave the father a card with a telephone number at the precinct for the lawyer to call.
The detectives took the defendant in custody to the precinct. At 12:10 p.m. that day, Detective Salzo interviewed the defendant. Detective Miller was present, and Sergeant Moore went in and out of the room. The defendant was in handcuffs.
Salzo asked, "Detective Miller gave you your Miranda warnings. Did you understand them?”
The defendant answered, "yes”.
"They still apply now. You don’t have to speak to us. Okay?”
*340 "All right, I understand. I will speak to you.”
In the course of the interview, the defendant confessed to three armed robberies of Chinese restaurants committed with Quy Lam, including those at the Kar Restaurant.
At the hearing the defendant testified about gross mistreatment during this interview, including the tightening of handcuffs, ethnic slurs, physical force, threats of force, and the threat to pin 80 cases on him. This was contradicted in effect by Detectives Salzo and Miller and expressly contradicted by Sergeant Moore on rebuttal. I accept their version over the defendant’s with one notable exception.
Remaining unexplained by the three detectives is why the defendant confessed to several armed robberies after his parents had said that they were going to get a lawyer for him, and after the defendant understood that he did not have to speak until a lawyer had arrived. I reject Sergeant Moore’s testimony that the detective leading the interview, Salzo, had only "a couple” of folders in his possession during the interview. It is clear from the testimony of the three detectives that the interview with Lee was the culmination of a massive, prolonged investigation of numerous similar "pattern” robberies of Chinese restaurants by a suspected gang of Asian robbers. It is incredible that in such an interview Salzo would have asked only about a couple of cases. I find convincing the defendant’s testimony that the detective threatened to pin a large number of similar robberies on him if he did not confess and cooperate. However, I reject the large number, 80, described by the defendant.
Nevertheless, with respect to classical coercion, I find beyond a reasonable doubt that the defendant’s confession to three robberies was not classically coerced, and that the threat to the defendant to pin other cases on him was not of the kind to overcome his will or to lead to a substantial risk of false incrimination. (See, CPL 60.45 [2].)
The detectives were still interviewing the defendant when a lawyer telephoned the precinct at 1:50 p.m. to tell Detective Miller that she represented Lee and that the questioning should close. At this point, the questioning was ended.
THE RIGHT TO COUNSEL AT THE INTERROGATION
An important issue of fact and law presented by the foregoing facts is whether the defendant’s parents sufficiently invoked his right to counsel, thereby requiring suppression of *341 the confession, and whether the defendant voluntarily waived his right to counsel.
If a defendant unequivocally states an intention to retain a lawyer, the police may not question the defendant, even if the questioning is noncustodial. (People v Rowell, 59 NY2d 727, 730; see also, People v Johnson, 55 NY2d 931.) The request can be made to a third person if it is heard by the police. In People v Buxton (44 NY2d 33, 35), the defendant on his arrest at work called out to his supervisor, "Call my wife and call my lawyer.” This was held to be sufficient to invoke his right to counsel.
The right to counsel also arises if the defendant actually has a lawyer in the case who has communicated with the police (People v Pinzon, 44 NY2d 458), or if the defendant says that he is expecting the lawyer to arrive. (People v Ellis, 58 NY2d 748.)
For minors, persons under 16, who are questioned in custody there are special rules. As was said in People v Pica (159 AD2d 524), when a minor is residing in the home of his parents, the police have an obligation to establish and maintain procedures so that the suspect is not deliberately or inadvertently held beyond the reach of his parents. For suspects 16 and older, however, there is no requirement that a parent be present during questioning, as there is for persons under the age of 16. (Family Ct Act § 724; CPL 140.20 [6].)
In this case much can be said why the right to counsel is not effectively invoked by a parent of a 17 year old by telling the police, as happened here, that the parent was going to get a lawyer for the child. Traditionally, as in all of the cases just cited, the right to counsel is invoked by the defendant; it is the defendant’s decision, not the parents’, whether a defendant age 16 or older should speak or remain silent. A parent’s presence is not required by law. The defendant was given all of his rights and understood them. Nor did the defendant ask at the precinct to speak to his parents or request a lawyer.
Nevertheless, on the facts as I find them, there was an effective equivalent to a statement by the defendant himself that he is going to get a lawyer. The defendant lived with his parents, who were responsible for him. They made it clear to the police and the defendant that they were going to get a lawyer, and that was in direct response to the giving of Miranda rights to the defendant, in the presence of the parents, which told the defendant that he did not have to say anything to the police until the lawyer arrived.
*342 Although the statement that the parents were going to get a lawyer was a statement of future intent, that statement was unequivocal and the intent not subject to doubt, even by the police. Thus, a detective gave the father his card with a number for the lawyer to call at the precinct. The lawyer called the detective two hours later.
No case has held directly that a parent can invoke a child’s right to counsel if the child is more than 15 years of age. But in People v Cody (162 AD2d 696, 697), the Appellate Division made a statement that can be interpreted in no other way unless it is deemed to be superfluous to the decision: "Although the State Police were informed by the defendant’s father * * * that he intended to contact an attorney on the defendant’s behalf, this was insufficient to cause the defendant’s right to counsel to attach as the defendant was not then in custody” (emphas'» ' ided).
The defendant Lee was in custody. If the Cody statement means anything, the right to counsel attached here when the father announced his intent to get a lawyer for his son.
In People v Rivera (72 AD2d 780), the Court held that if the defendants’ family or social worker had asked the police to delay interrogating the 16- and 17-year-old defendants until a lawyer could be obtained, that would require suppression of their confessions. The Court ordered a hearing on that question of fact. I have found that the defendant’s parents did not specifically tell the police not to question the defendant until the lawyer arrived. Nevertheless, the intent to obtain a lawyer to advise the defendant at the precinct was clear to the detectives and to the defendant.
It is well settled that a parent is empowered to consent to the search of a minor’s room. (People v Satornino, 153 AD2d 595; People v Thebner, 168 AD2d 653, lv denied 77 NY2d 911; People v Auxilly, 173 AD2d 627, lv denied 78 NY2d 1125.)
Analogously, a parent who is responsible for an unemancipated child is empowered to invoke the minor’s right to counsel.
As a matter of law, on the facts as I have found them to be, at the very least the police were required either (1) to tell the defendant at the precinct that he had the right not to speak until the arrival of the lawyer whom the parents were seeking to retain, and were required to verify that the defendant understood that, or (2) to wait a reasonable time for a lawyer to come before questioning the defendant. They did neither.
*343 In addition, I find as a fact that I have a reasonable doubt under all of the circumstances whether at the precinct the defendant understood his right to counsel contained in the Miranda warnings given at the school and whether he voluntarily, intelligently, and knowingly waived that right. It is not required as a matter of law in every case that Miranda warnings given at the scene of an arrest be repeated at the police station before interrogation. But in this case, because of the unusual events at the school, including the parents’ declaration in the defendant’s presence, after the Miranda warnings on the right to consult a lawyer, that they were going to get the son a lawyer, the police were required to repeat the Miranda warnings at the precinct or take the risk that the failure to repeat them after that significant intervening event would weigh heavily in this court’s fact finding, as it does. Other circumstances are also significant in my reaching this factual conclusion: the young defendant had never been arrested before, he was handcuffed while interrogated, and the detective threatened to pin other robberies on him.
In People v Blasingame (65 AD2d 455), the defendant’s father’s statement at arraignment that he was going to get a lawyer for his son precluded questioning thereafter, because the criminal action had begun. On that fact, Blasingame is distinguishable. Additional reasoning of the Court applies here, however. On the factual question whether the defendant intelligently and knowingly waived his Miranda rights the Court found it significant that the defendant’s father had made it clear to the police that he was seeking a lawyer. That announcement of purpose contributed to the Court’s finding that the right to counsel had not been intelligently waived.
Here, as in Blasingame (supra), the parent’s statement of intent is given great weight on the factual question whether the defendant voluntarily, knowingly, and intelligently waived his right to counsel at the precinct.
CONCLUSION
For both indictments the motion to suppress the statement is granted.