THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN YOUNG, JR., Defendant-Appellant.

First District (1st Division)    No. 1—04—2176

Opinion filed April 24, 2006.

Michael J. Pelletier and Adolfo Mondragon, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Samuel Shim, and Joseph S. Beemsterboer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Defendant, John Young, Jr., appeals from his conviction and sentence for first degree murder after a jury trial. On appeal he contends that the circuit court erred in: failing to suppress a confession he gave to police after his father said that he was going to call his lawyer; adding 25 years to his sentence for discharging a firearm in the commission of the murder; ordering the extraction of his DNA for storage in a state database; and entering convictions for four counts of first degree murder when there was only one physical act and one decedent. For the following reasons, we affirm, but order the correction of his mittimus.

## FACTUAL BACKGROUND

We begin by providing a general account of the facts underlying this case. Additional facts will be set out where necessary to address defendant's specific appellate contentions.

Belinda Hale, Robert Mickey, and Ramona Shields testified in the State's case in chief at defendant's trial. Each testified that the victim, Charles Washington, attempted to break up a fight between defendant and Mickey on the night of October 10, 2001. Hale and Shields explained that defendant then left the scene, but returned and started fighting with Washington. Hale and Shields further stated that defendant left a second time, but again returned, and, at that time, fatally shot Washington.

Approximately three weeks later, defendant was arrested for the killing. While in custody, defendant gave a videotaped confession that was substantially similar to the account of Hale, Mickey and Shields, which was published to the jury. At the time he gave this confession, defendant was approximately two months shy of his seventeenth birthday and had no recorded prior contact with the criminal justice system.

Defendant was subsequently charged with six, largely overlapping, counts of first degree murder. Count I alleged that defendant "without lawful justification, intentionally or knowingly shot and killed Charles Washington while armed with a firearm"; count II alleged that "he, without lawful justification, shot and killed Charles Washington while

armed with a firearm, knowing that such act created a strong probability of death or great bodily harm"; count III alleged that "he, without lawful justification, intentionally or knowingly shot and killed Charles Washington with a firearm, and during the commission of the offense he personally discharged a firearm" (the State subsequently elected not to prosecute this charge); count IV alleged that "he, without lawful justification, shot and killed Charles Washington with a firearm, knowing that such act created a strong probability of death or great bodily harm to Charles Washington, and during the commission of the offense he personally discharged a firearm" (the State, likewise, subsequently elected not to prosecute this charge); count V alleged that "he, without lawful justification, intentionally or knowingly shot and killed Charles Washington with a firearm, and during the commission of the offense he personally discharged a firearm that proximately caused death"; finally, count VI alleged that "he, without lawful justification, shot and killed Charles Washington with a firearm, knowing that such act created a strong probability of death or great bodily harm to Charles Washington, and during the commission of the offense he personally discharged a firearm that proximately caused death."

Defendant testified on his own behalf in his portion of the case. He stated that he and his brother were in a confrontation with Mickey and another man, Nasean Taylor. During the confrontation, Taylor pointed a gun at him. Defendant testified that Mickey then punched him and that Washington joined the fray and choked him. Defendant tried to fight them off, in the process pulling out his gun and firing twice. Defendant testified, however, that it was not his intent to shoot Washington, that he shot without aiming. Defendant attempted to explain away his confession by testifying that the police and an assistant State's Attorney had instructed him what to say.

In rebuttal, the State presented the testimony of the youth officer and the assistant State's Attorney involved in the taking of defendant's confession. Each testified that he never coached or observed anyone else coach defendant on what to say.

The jury found defendant guilty of first degree murder and, in answer to a special interrogatory, found that he personally discharged a firearm that proximately caused death during the commission of the offense. The circuit court sentenced defendant to 20 years in prison for the murder and was required to add another 25 years to that sentence under section 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000)), which provides that "if, during the commission of the offense, the person

personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." The court entered a mittimus that reflected convictions for all four counts of first degree murder. The court also entered an order for defendant's DNA to be extracted and stored pursuant to section 5—4—3 of the Unified Code of Corrections (730 ILCS 5/5—4—3 (West 2004)).

## I. Regarding the Motion to Suppress

Prior to trial, defendant filed a "Motion to Suppress Statements." In his motion, defendant alleged that he had not received *Miranda* warnings, that he had been physically assaulted through a series of slaps during questioning, that police misrepresented that he could go home if he would confess, and that questioning did not cease even though he had requested the assistance of counsel. Chicago police officers Hladik, Jones, Schleder, and Daniels, as well as Assistant State's Attorney Hofeld, private criminal defense attorney Salerno, and defendant's father, John Young, Sr., all testified at the hearing on defendant's motion to suppress.

Officer Hladik testified as to defendant's initial arrest and his transportation to Area 4 police headquarters. Hladik testified that he set up a surveillance of 2732 West Monroe Street around noon on November 2, 2001, acting on a report from another tactical officer that defendant had been seen in that area. During his surveillance, Hladik, in fact, saw defendant walking west on Monroe. He then called his partners to detain defendant. Though defendant fled into the building at 2732 West Monroe upon the officers' approach, the six other officers were able to take him into custody. Hladik explained that none of the officers gave defendant his *Miranda* warnings at that time because their only intention was to transport him to Area 4, not to interrogate him. Hladik testified that he never slapped defendant and that he never observed any of the other officers at the scene slap him. Hladik denied that anyone ever promised defendant that, if he would give a statement to the police, he could go home. Finally, Hladik indicated that neither he nor any of his fellow officers at the scene fit the physical description provided by defendant of the officers who allegedly abused him.

Detective Jones testified that he met defendant in an interview room at Area 4, during his investigation of the murder of Washington, on November 2, 2001. Jones first conversed with defendant at approximately 2:45 in the afternoon. Also present with Jones were Detective Schleder and John Young, Sr., whom Jones knew to be defendant's

father. Jones testified that he began by advising defendant of his *Miranda* rights by reading them out of a Fraternal Order of Police handbook. According to Jones, defendant indicated that he understood his rights and that he would speak with them. Jones testified that questioning stopped, however, because "John Young, Senior, indicated that he wanted to call an attorney, and \*\*\* to use the telephone." When asked for clarification, Jones testified that John Sr. indicated that he was calling an attorney for himself, that "he wanted to call his attorney." On cross-examination, however, Jones admitted that he had only documented that John Sr. asked to call his attorney; he had not documented in his investigation report that John Sr. called the attorney for himself. The detectives allowed John Sr. to use one of the station's telephones. John Sr. told Jones that he would call back and then left Area 4. But, John Sr. never called or came back.

Jones testified that an attorney, Alexander Salerno, did come to the station around 6:30, however. When Salerno arrived, he asked to speak with John Sr. He further inquired if John Sr. was a suspect in the homicide. Jones testified that Salerno never inquired of him if defendant would be charged with any crime, though he admitted that the question might have been asked of his partner, since the asking of that question was contained in an investigation report. Salerno spoke with defendant alone for about five minutes, but, according to Jones, never asked to be present should the police continue questioning defendant. Jones did concede that Salerno inquired if defendant would be placed in a lineup. At one point, defendant, Salerno, Jones and Schleder all stood together at the doorway of the interrogation room. At that time, defendant made no statement that Salerno was his attorney or that he wished to remain silent; his only request was for something to eat and a cigarette.

Jones testified that he gave Salerno his business card and asked him to ask John Sr. to return to the station because he and his partner wanted a parent present during further questioning of defendant. Salerno did not provide Jones with his business card. John Sr. did call later, but only to inquire when his other son being held at Area 4, Terrance Poindexter, would be released; he made no mention of defendant at that time.

Around 7, the detectives again met with defendant. At this time, they were joined by Assistant State's Attorney Hofeld and youth investigator Battaglia, who was present "because there was no one there who would be concerned with the rights of defendant." ASA Hofeld explained to defendant his options in giving his statement and defendant elected to have his statement recorded on videotape. The State introduced written consents to videotape the statement signed by Jones and defendant.

The actual rendition of the videotaped statement did not take place until approximately 11 p.m. Jones testified that defendant received *Miranda* warnings again during the videotaped statement and that he never invoked either his right to remain silent or his right to counsel. Jones testified that he never slapped defendant, that he never saw anyone else slap defendant, that he saw no signs of physical abuse on defendant's person, and that nobody promised defendant that he could go home if he gave a statement.

Detective Schleder next testified for the State. Schleder confirmed Jones' account of the initial conversation with defendant around 2:15 p.m., corroborating that defendant received his *Miranda* warnings and that John Sr. asked to be excused to call his attorney, and then to leave to make arrangements with his attorney. Schleder testified that he and Jones told John Sr. that they wanted him to return to be present during questioning, but that he did not. Schleder confirmed that the next time they heard from John Sr. was when he called to inquire about his other son.

Schleder testified that he, Battaglia, and Hofeld next interviewed defendant around 5:15 p.m. Schleder observed Hofeld readminister the *Miranda* warnings to defendant, with Hofeld asking defendant to repeat each warning and to explain its meaning. According to Schleder, at that time, defendant never asked for a lawyer, never claimed to have a lawyer, and never stated that his father was going to procure a lawyer for him. Schleder conceded, however, that, in the period between the initial conversation and the second interview, he was waiting for John Sr. to return with a lawyer. Schleder further conceded that John Sr. was not a suspect in the offense for which defendant had been arrested.

Schleder met with attorney Salerno when he arrived. Schleder testified that "basically all he was concerned with" was John Sr. "He kept asking me if John, Senior, was involved in the investigation, if we were looking at John, Senior, in any way as a suspect." However, Schleder also testified that Salerno asked him if defendant was going to be charged, and that he told the attorney that "at this point it was an investigation of a homicide." The attorney further asked Schleder if any lineups would be conducted and Schleder told him that none would be necessary. Schleder corroborated Jones' account that Salerno never asked to be present if defendant was questioned. Schleder testified that he was surprised that Salerno never made such a request. Schleder only recalled defendant asking for a cigarette when the detectives, defendant and Salerno all stood at the entrance to the interrogation room.

Schleder gave Salerno his business card and asked him to see if he

could get John Sr. to come back since he was not responding to the police's attempts to call him. When he left, Salerno said that he was going to contact John Sr. Salerno told Schleder that he would be in touch with John Sr. within 15 minutes and would have him call the detectives or come back to Area 4.

Finally, Schleder testified that he never made any promise to defendant that he could go home if he gave a statement and that he never slapped defendant. Schleder likewise testified that neither he, nor any officer he knew, fit the description given by defendant as the officer hitting him.

Assistant State's Attorney Hofeld was the State's next witness. Hofeld testified that he first met defendant around 5:15 p.m. at Area 4; also present at the time were Battaglia and Schleder. Hofeld introduced himself as a prosecutor and then read defendant his *Miranda* rights, and also advised defendant that he could be charged as an adult. After each warning, he asked if defendant understood that particular admonition. At the conclusion of the recitation of his rights, Hofeld asked defendant to explain, in his own words, what those admonitions meant. According to Hofeld, defendant explained "I don't have to talk to you"; "you can tell the judge what I say to you"; "I have a right to my own lawyer" and "if I don't have enough money for lawyer, to hire a lawyer, I can be given a lawyer anyway"; and "that he would go to adult court, as opposed to juvenile court, and that would be here at 26th and California as opposed to over at Juvenile Court." Hofeld then asked defendant if he wanted to tell him what happened. Defendant agreed to speak with him and made an incriminating statement. This encounter lasted between 30 to 45 minutes.

Hofeld next spoke with defendant at 7 p.m. to discuss the various means of memorializing his statement. Defendant elected to have his statement videotaped. Hofeld then asked Jones and Battaglia, who were also present, to give him a few moments alone with defendant. While alone with defendant, Hofeld inquired about how the police treated him. Defendant told Hofeld that the police treated him "fine," that he was given "Burger King, pop, and some chips," as well as cigarettes, and that he was allowed to use the restroom "whenever he needed." Hofeld identified a consent to videotape form signed by defendant and himself, dated November 2, 2001. The taping began at 11 p.m.

The State published excerpts of the tape addressing the allegations in the motion to suppress. In one excerpt, Hofeld again identified himself as a prosecutor and not defendant's lawyer. In that same excerpt, Hofeld "re-*Mirandized*" defendant, again, asking if he

understood each right immediately after it was given, as well as asking defendant to explain the meaning of the right in his own words, as follows:

"MR. HOFELD [Assistant State's Attorney]: Okay. Now, I'm gonna read you your rights again. Do you understand that you have the right to remain silent?

DEFENDANT: Yes.

MR. HOFELD: Okay. And when I say that you have the right to remain silent, what does that mean?

DEFENDANT: I ain't got to talk if I don't want to.

MR. HOFELD: Okay. That's correct. And do you also understand that anything you say can be used against you in a court of law.

DEFENDANT: Yes.

MR. HOFELD: Okay. And what does that mean?

DEFENDANT: That you can tell the judge or anybody else.

MR. HOFELD: Okay. And do you also understand that you have the right to talk to a lawyer and have him present with you while you're being questioned?

DEFENDANT: Yes.

MR. HOFELD: Okay. And what does that mean?

DEFENDANT: I have the right to my own lawyer.

MR. HOFELD: That's correct. And that—your own lawyer could be here during questioning, is that correct?

DEFENDANT: Yes.

MR. HOFELD: Okay. And do you understand that even if you could not afford to hire a lawyer and you want one, a lawyer could be appointed and will be appointed by the court to represent you before any questioning?

DEFENDANT: Yes.

MR. HOFELD: Okay. And what does that mean when I say that?

DEFENDANT: If I don't have one, you all will provide me with one.

MR. HOFELD: That's correct. And that's even if you or your family can't afford that?

DEFENDANT: Yes.

MR. HOFELD: Okay. Now, do you understand that although you are a juvenile, you will be tried as an adult?

DEFENDANT: Yes.

MR. HOFELD: Okay. And what does that mean when I say that you'll be tried as an adult?

DEFENDANT: Although I'm a minor, I'll be charged as a grown person.

MR. HOFELD: Okay. And which type of—what type of court will you go to as—if you're tried as an adult?

DEFENDANT: Adult court.

MR. HOFELD: Okay, that's correct. Now, understanding all of those rights, do you wish to talk to us now?

DEFENDANT: Yes."

Defendant went on to state on the tape that his father had been present earlier and that he had received his rights from the detectives in his father's presence; that he had received the opportunity to speak with youth officer Battaglia in private; that Battaglia had brought him food and drink, and that Jones and Schleder had also brought him food and drink; that he was allowed to use the restroom or smoke cigarettes whenever he desired; that no threats or promises had been made to him; that he had never been in handcuffs; that he was not under the influence of any substances; and that the treatment of him by everyone involved in the interrogation had been "good."

ASA Hofeld acknowledged that he was aware that an attorney had previously arrived, but stated that he never had contact with attorney Salerno. Hofeld denied that defendant ever told him that Salerno was his lawyer or that he ever made any request for counsel. He stated that no one told him that Salerno requested to be present if defendant was going to be questioned further. Hofeld testified that defendant never described any physical abuse to him, that he saw no signs of abuse to defendant, that he never abused defendant, and that there was nobody he was acquainted with as being involved in the investigation who fit the description of the person defendant alleged had slapped him.

The State's case closed with the testimony of Officer Daniels, who administered the lockup at Area 2. Daniels testified that he performed an intake procedure with each person brought to the lockup, including asking if the detainee required a phone call and if he needed medical attention. Daniels asserted that defendant indicated no need for medical attention and stated that he had nobody to call. Daniels further testified that he performed a visual inspection of detainees to ensure their physical well-being and that he noticed no signs of abuse during his inspection of defendant.

Defendant presented attorney Salerno as the first witness in his case. Salerno testified that he received a call from John Sr., after which he went to Area 4. He denied that his purpose in going to Area 4 was to represent John Sr. At Area 4, he requested, and was granted, the opportunity to speak with defendant. He then spoke with detectives whose names he could not recall. Salerno acknowledged that he first inquired about John Sr. Salerno testified "Mr. Young, Senior said that they were trying to ask him questions. I couldn't understand how he was involved or what the story was concerning him." According to Salerno, the detectives told him that John Sr. was not involved in the

case and that they only wanted him present while they questioned defendant.

Attorney Salerno then inquired about the incident leading to the questioning of defendant and whether he was being charged with an offense. The detectives told him that the investigation surrounded a shooting in public, to which there were multiple witnesses, but that defendant was not being charged at that time. Salerno testified that he informed the detectives that he wished for either himself or his investigator to be present in the event defendant was included in any lineups, and for himself to be present in the event of any questioning of defendant. Salerno "believed" that he gave the detectives his business card, which included a number at which he could be reached at any time.

On cross-examination, Salerno admitted that John Sr. had not retained him to represent defendant, they had only had a conversation "about possible representation." Salerno further admitted that defendant never explicitly asked him to be his lawyer. But, he and defendant had a discussion "about the case and what was happening to him" during which, Salerno claimed, defendant "invinced [sic] the intent" to retain him. However, Salerno conceded that neither he nor defendant expressed to the detectives, after their conversation, that he was defendant's lawyer and that defendant would also be invoking his right to remain silent. Salerno acknowledged that he never spoke with John Sr. after November 2, 2001, and that he had no further involvement in the case.

John Young, Sr., was the final witness for the defense. John Sr. testified that he received a call from his mother on November 2, 2001, wherein she told him that police had kicked in the door of her home and arrested defendant. He went to his mother's home and, while repairing the door, was approached by police himself. The police told him that he would have to accompany them and placed him in a car; his other son, Terrance Poindexter, was also taken and placed in another car. The police took the two to Area 4.

When they arrived, John Sr., though informed that he was not presently going to be charged, was handcuffed to a railing pending the arrival of detectives, who, he was told, would make the ultimate charging decision. When the detectives arrived, they informed John Sr. that he was not being charged, asked for his permission to question defendant, and told him that they would like for him to be present during questioning. John Sr. testified that he denied the detectives permission to speak to his son, stating "I told them no. Let me call a lawyer." The detectives allowed him to use a telephone in the station. John Sr. testified that he called attorney Salerno and told him that he

was free to go, but that he needed him "to come down to represent John, Jr." The police had told John Sr. that Terrance was not under arrest and was only being held for questioning, but that defendant would be charged with murder. According to John Sr., the detectives asked him for the name and telephone number of the attorney and he provided that information to them.

John Sr. left Area 4. He testified that he never told the detectives that he would return. But, while he was in the process of returning there, later that evening, he encountered attorney Salerno around the intersection of Sacramento and Harrison. Salerno told John Sr. that he spoke with defendant, told him not to answer any questions, and to call his father who would contact him if he had any problems. According to John Sr., Salerno told him that he had told the police that he wanted to be present if they would question defendant.

John Sr. denied that he hired Salerno to represent him. He testified, "I wasn't concerned about myself because I know I didn't do anything." John Sr. admitted, however, that he never paid Salerno any money or did "anything to retain his services to represent" defendant. John Sr. further admitted that he heard the detectives administer *Miranda* warnings to defendant, and in particular, his right to remain silent and his right to an attorney. He conceded that he never explicitly told defendant that he was going to hire an attorney for him, but suggested defendant knew that that was his intention since defendant heard him tell the detectives he was going to call a lawyer. He suggested he would have informed defendant that an attorney was on his way to help him, but that the detectives refused to allow him to speak with defendant again after he left the interrogation room. John Sr. conceded, however, that he never made any efforts to contact defendant after leaving the station. John Sr. testified that, as far as he could see, defendant was in good condition when he saw him at Area 4 and that he did not notice anything unusual about his face. Finally, John Sr. admitted that he had been convicted of three felonies over the last 12 years, including one conviction for filing a false police report.

In closing argument, defendant contended that it was "clear" and "could not be clearer" that the right to remain silent and to counsel had been invoked through the actions of John Sr. and attorney Salerno. The State, on the other hand, stressed that defendant was repeatedly given *Miranda* warnings, yet continued to make statements. The State challenged defendant's assertion that Salerno's actions suggested any invocation of rights by defendant. The State argued that, if defendant had invoked his right to remain silent, for

example, Salerno would not have needed to ask to be present if the police were to reinitiate questioning because no further questioning could actually take place. The State also emphasized that defendant never told Salerno that he wanted him to be his lawyer and that Salerno never told the police that defendant had asked for him to be his lawyer. Finally, with respect to other aspects of the voluntariness of defendant's incriminating statements, the State observed that the interrogation took place over a relatively short period of time, that defendant was given food and drink, and that defendant was otherwise well treated, specifically noting defendant's failure to support the allegation of physical abuse contained in his motion.

The circuit court declined to suppress defendant's statements. The court ruled that, under the totality of the circumstances, defendant's statements were voluntarily made. The court observed that defendant had been repeatedly given *Miranda* warnings and demonstrated that he understood them. From his conduct in the videotape, the court concluded that defendant was "calm," "intelligent and articulate." The court acknowledged that defendant was a juvenile, but noted that he was bordering on 17 years of age, and emphasized that he never told the police that he was invoking his rights.

On appeal, defendant contends that the "record demonstrates that [defendant's] father clearly and unambiguously invoked [defendant's] right to counsel." He argues that this conclusion is evidenced not only by John Sr.'s words, but also by the detectives' response to those words, specifically, their temporary cessation of interrogation. Defendant claims that, because the detectives later continued their interrogation of defendant after this third-party invocation of counsel for defendant, his confession must be suppressed under both the federal and Illinois constitutions. We disagree.

■ The fifth and fourteenth amendments to the United States Constitution and article I, section 10, of the Illinois Constitution of 1970 prohibit the government from compelling a citizen to incriminate himself. In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court devised rules to ensure that the right to be free from coerced self-incrimination retained meaning, including, upon request by the suspect, that the suspect have counsel present during custodial interrogation. *Miranda*, 384 U.S. at 474, 16 L. Ed. 2d at 723, 86 S. Ct. at 1627-28. An "accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the

police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885 (1981). Moreover, once invoked, the right to be free of interrogation without the presence of counsel continues unabated, even after the suspect has been afforded an initial consultation with an attorney; he does not need to continually reinvoke his rights. See *Minnick v. Mississippi*, 498 U.S. 146, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990). The rule of *Edwards* is a bright-line rule that "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of *Miranda* in practical and straight-forward terms." *Minnick*, 498 U.S. at 151, 112 L. Ed. 2d at 496, 111 S. Ct. at 489-90. However, "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and [his] waiver [of those rights] is valid as a matter of law." *Moran v. Burbine*, 475 U.S. 412, 422-23, 89 L. Ed. 2d 410, 422, 106 S. Ct. 1135, 1141 (1986).

As previously noted, defendant asserts that John Sr. "clearly and unambiguously" invoked defendant's right to counsel. He must describe the invocation in those terms for, to be entitled to the protection of *Edwards*, "the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459, 129 L. Ed. 2d 362, 371, 114 S. Ct. 2350, 2355 (1994). If "a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [United States Supreme Court] precedents do not require the cessation of questioning." (Emphasis in original.) *Davis*, 512 U.S. at 459, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355. See also *People v. Krueger*, 82 Ill. 2d 305, 311 (1980) ("We do not believe *** that every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel"); *People v. Sommerville*, 193 Ill. App. 3d 161, 169 (1990) ("simply referring to an attorney *** does not automatically constitute an invocation of the right to counsel"). "[T]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether an accused actually invoked the right to counsel under *Edwards* and *Miranda* "is an objective inquiry." *Davis*, 512 U.S. at 458-59, 129 L. Ed. 2d at 371, 114 S. Ct. at 2355. A court must evaluate whether "a reasonable police officer in the circumstances would understand the [accused's] statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 129 L. Ed. 2d at 371, 114 S.

Ct. at 2355. Applying this objective standard, we do not agree that there was an unambiguous invocation of the right to counsel.

The circuit court found the testimony of the detectives to be credible. The court serves as the fact finder and weighs the credibility of the witnesses at a suppression hearing. See *People v. Perkins*, 248 Ill. App. 3d 762, 767 (1993). Each detective testified that John Sr. asked to call *his* attorney. On its face, this statement is objectively ambiguous as to who the attorney would have been meant to serve and for what purpose. Defendant claims that the statement could only have meant that the attorney was for him since his father was aware that he was not a suspect. However, as the State points out, defendant was not John Sr.'s only son in custody at the time. Moreover, the mere request to call an attorney does not necessarily suggest that a suspect is refusing to cooperate with the police without a lawyer present. For example, in *Sommerville*, after he was placed under arrest, the defendant called out to his girlfriend " 'to call my attorney.' " *Sommerville*, 193 Ill. App. 3d at 169. The *Sommerville* court held that "that request in no way communicated to the police officers that he wanted an attorney present before any questioning could take place," noting "such a statement could reasonably be interpreted as merely a way to find out if the attorney would be available to handle the case." *Sommerville*, 193 Ill. App. 3d at 169-70. See also *People v. Thompkins*, 121 Ill. 2d 401, 434 (1988) ("We cannot agree with defendant that 'his speaking with an attorney whom he wished to retain after having received the *Miranda* warnings' constituted the invocation of his fifth amendment right to counsel"); *State v. Lamp*, 322 N.W.2d 48, 55 (Iowa 1982) (holding that a defendant had not invoked his right to silence or counsel merely by calling an attorney, and stating "[u]nlike the circumstances in *Edwards*, defendant did not express a desire to deal with the law enforcement officials only through counsel"). Thus, it would seem true here, as well, that there was no unambiguous request for counsel for defendant.

However, even if there were an unambiguous request for counsel for defendant by John Sr., there would remain the question of whether a third party could validly invoke the right to counsel for a suspect. As the State points out, as a matter of federal constitutional law, at least as to adults, the issue is settled under the holding of *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986). In *Moran*, a suspect's sister attempted to retain counsel for her brother. An attorney called the police station on his behalf and stated that she would represent defendant in the event of any interrogation or lineups involving the suspect. The police officer taking the attorney's call informed

her that they were through with the suspect for that evening. However, officers from another police department, investigating a separate crime from that which had led to his initial arrest, did interrogate the suspect that night and acquired his confession. *Moran*, 475 U.S. at 416-18, 89 L. Ed. 2d at 417-19, 106 S. Ct. 1138-39. The suspect had been repeatedly advised of his *Miranda* rights prior to confessing and was unaware of either his sister's or the attorney's efforts to aid him. *Moran*, 475 U.S. at 417-18, 89 L. Ed. 2d at 418-19, 106 S. Ct. at 1139. The *Moran* Court rejected the suspect's claims that his sister's and the attorney's actions amounted to an invocation of his right to counsel and that the failure to notify him of their efforts rendered his waiver of his rights involuntary. The *Moran* Court observed both that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right" (*Moran*, 475 U.S. at 422, 89 L. Ed. 2d at 421, 106 S. Ct. at 1141) and that "the privilege against compulsory self-incrimination is, by hypothesis, a personal one that can only be invoked by the individual whose testimony is being compelled" (*Moran*, 475 U.S. at 433 n.4, 89 L. Ed. 2d at 428 n.4, 106 S. Ct. at 1147 n.4). See also *First Defense Legal Aid v. City of Chicago*, 319 F.3d 967 (7th Cir. 2003) (following *Moran* in holding that attorneys could not invoke the right to counsel for their clients and demand admission into interrogations).

It might appear that our analysis would be different with respect to the Illinois Constitution. In *People v. McCauley*, 163 Ill. 2d 414, 423 (1994), our supreme court, in departing from the holding of *Moran*, stated: "The day is long past in Illinois, however, where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door. In this case, we determine that our State constitutional guarantees afforded defendant a greater degree of protection." The *McCauley* court went on to explain that as part of that expanded protection, " 'when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him.' " *McCauley*, 163 Ill. 2d at 425, quoting *People v. Smith*, 93 Ill. 2d 179, 189 (1992). But, our departure from *Moran* under state law stopped at the issue of whether a waiver of rights could be voluntary when the suspect was not informed that an attorney was at the police station seeking to speak with him. No Illinois decision has ever disclaimed the other major holding of *Moran*, that the right to counsel was personal and could only be invoked by

the suspect; rather, our courts have reaffirmed that principle. See *McCauley*, 163 Ill. 2d at 445 ("While we recognize that an accused alone invokes the right to counsel, we are unwilling to dismiss an available retained or appointed attorney's efforts to gain access to his suspect-client as constitutionally insignificant to the capacity of the suspect to make a knowing and intelligent choice to relinquish his right to the attorney's presence"); *People v. Griggs*, 152 Ill. 2d 1, 28 (1992) ("we are not recognizing a right on the part of the attorney 'to invoke the personal right of the suspect to advice and presence of counsel. [Citations.] This *** misunderstands the underlying premise of requiring the police to inform a suspect of the efforts of counsel' ").

Courts have applied the no-third-party-invocation rule to attempts by nonfamily members to invoke the right to counsel for others. See *State v. Stanislaw*, 153 Vt. 517, 531, 573 A.2d 286, 294 (1990) (holding a coworker's statement to police that a lawyer would be procured for the suspect not to be a valid invocation of his personal right to counsel). Courts have likewise applied the rule even when attempted by family members, like in *Moran*, and, more specifically, when attempted by parents of adult children. See *Terry v. LeFevre*, 862 F.2d 409, 412 (2d Cir. 1988) ("there is no legal support for the argument that Mrs. Terry could invoke the right to counsel on behalf of her son. Absent a showing that Terry desired an attorney and directed his mother to obtain counsel for him, we conclude that Terry's right to counsel had not been invoked"); *People v. Benoit*, 240 Ill. App. 3d 185, 189 (1992) ("Even if defendant's father did tell the officers not to question defendant until he obtained counsel, defendant was an adult and it was defendant's obligation to exercise his right to counsel"). Moreover, the majority of courts have applied this rule even when the suspect was a minor (see *State v. Kramar*, 149 Wis. 2d 767, 440 N.W.2d 317 (1989); *State v. Cook*, 138 Or. App. 401, 909 P.2d 202 (1996); *Whitaker v. Meachum*, No. 2:92CV689 (D. Conn. 1996); *Oquendo v. Scully*, No. CV 89—1203 (E.D.N.Y. 1990)), and we find these cases to be persuasive.

In *State v. Cook*, 138 Or. App. 401, 407, 909 P.2d 202, 205 (1996), a 14-year-old defendant contended "that if the law permits parents to speak for their children in matters concerning education, discipline and health care, parents should similarly be able to invoke a child's right to counsel, even if the child has already waived that right." The Court of Appeals of Oregon rejected the argument, however, holding that "*the suspect* retains ultimate control over the decision whether to invoke or waive the right to counsel." (Emphasis in original.) *Cook*, 138 Or. App. at 408, 909 P.2d at 206. Likewise, the Wisconsin Supreme Court held, in a case where a 16-year-old defendant asserted that his

mother invoked his right to counsel by telling police to call his attorney:

> "Since the right to counsel and the right to remain silent are given by the constitution to the defendant, he alone can exercise those rights. Neither his family nor his attorney are threatened with accusations, nor do they have the defendant's knowledge of the case, including the defendant's knowledge of his own guilt or innocence, nor are they subject to the pain of the defendant's possibly guilty conscience. Therefore, no one but the accused can make the decision to make a statement to the police or to ask for the assistance of counsel in making his decision. [Citation.]" *State v. Kramar*, 149 Wis. 2d 767, 786, 440 N.W.2d 317, 325 (1989).

See also *Whitaker v. Meachum*, slip op. at ___ ("the [17-year-old] petitioner's mother's statement that she wanted her son to speak to an attorney was ineffective to invoke the petitioner's right to counsel"); *Oquendo v. Scully*, slip op. at ___ (stating, in a case involving a 17-year-old defendant, "As a general rule, however, if *Miranda* rights are voluntarily waived by an accused, they cannot be invoked on his behalf by a third party"); *Conner v. State*, 334 Ark. 457, 465-66, 982 S.W.2d 655, 659 (1998) (refusing to suppress statements, where a statute proscribed interrogation if a minor requested to speak with a parent or guardian or to have a parent or guardian present, when "[a]lthough there [was] evidence in the record that [the 17-year-old defendant's] mother requested to speak to her son, there [was] no evidence that [defendant] himself invoked his statutory right").

Defendant, however, contends that "the privilege affords a minor's parent the ability to invoke a minor's right to counsel because there are special concerns when minors are questioned in custody." He cites to three cases in support of his proposition: *Idaho v. Doe*, 137 Idaho 519, 50 P.3d 1014 (2002); *United States v. Doe*, 60 F.3d 544 (9th Cir. 1995); and *People v. Lee*, 155 Misc. 2d 337, 589 N.Y.S.2d 263 (1992).

We find the authority on which defendant relies to be unconvincing. It is true that *Idaho v. Doe* stated that "[a] minor's parent may invoke the right to counsel for the child, but that request must also be clear and unambiguous." *Idaho v. Doe*, 137 Idaho at 525, 50 P.3d at 1020. However, the *Idaho v. Doe* court then went on to resolve the motion to suppress before it by determining that the defendant's mother's request for counsel was ambiguous, rendering its general statement about the validity of parental invocations mere *dictum*. See *United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (explaining one reason to hold a statement to be *dictum* "is that the passage was not an integral part of the earlier opinion—it can be sloughed off without damaging the analytical structure of the opinion"); *Cates v. Cates*, 156

Ill. 2d 76, 80 (1993) (defining *obiter dictum* as "a remark or opinion uttered by the way" and stating that "[s]uch an expression or opinion as a general rule is not binding"). Moreover, *Idaho v. Doe* cited to *United States v. Doe* for support of the proposition that parents could invoke the right to counsel for minors. However, *United States v. Doe*, in fact, made no such claim in its brief analysis on the issue of whether interrogation improperly continued after an invocation of the right to counsel, which we present in its entirety below:

"Officer Arvizu testified that near the end of a one hour interrogation, Doe's mother made a statement to the effect that 'maybe he ought to see an attorney.' To invoke the right to counsel, the suspect's request must be clear and unambiguous. [*Davis v. United States*, 512 U.S. 452, 459-60, 129 L. Ed. 2d 362, 372, 114 S. Ct. 2350, 2355-56 (1994).] Whether *Davis* applies without qualification directly to juveniles is not before us. The statement at issue was made by Doe's mother. The statement was not clear and unambiguous. [Citation.] The officers were not required to clarify her ambiguous statement. [Citation.] Doe did not invoke his right to counsel." *United States v. Doe*, 60 F.3d at 545.

It would seem, at best for defendant, that *United States v. Doe* assumed the existence of a right to third-party invocation for minors for the sake of argument, prior to disposing of its defendant's contentions, in any event, and just as in *Idaho v. Doe*, based on the ambiguity of the alleged invocation. This leaves defendant to rely on *Lee*.

In *Lee*, a single New York trial judge did explicitly state that a parent could invoke the right to counsel for his or her unemancipated child. *Lee*, 155 Misc. 2d at 342, 589 N.Y.S.2d at 267. The *Lee* court analogized that if a parent could consent to the search of a minor's room, a parent necessarily must be able to invoke a minor's right to counsel. *Lee*, 155 Misc. 2d at 342, 589 N.Y.S.2d at 267. However, it is worthy of mention that the *Lee* court itself recognized that its position was without precedential support. *Lee*, 155 Misc. 2d at 342, 589 N.Y.S.2d at 266. The *Lee* court also found it significant that its defendant heard his parents indicate that they would procure a lawyer in response to the provision of *Miranda* warnings, "which told the defendant that he did not have to say anything to the police until the lawyer arrived." *Lee*, 155 Misc. 2d at 341, 589 N.Y.S.2d at 266.

With regard to the *Lee* court's conclusion that, since parents are permitted to make other significant choices for their children, they are allowed to invoke the right to counsel, we observe that this position, as noted above, was explicitly rejected by the *Cook* court. See *Cook*, 138 Or. App. at 407-08, 909 P.2d at 205-06.

With respect to the *Lee* court's suggestion that a minor's overhearing a parent's statement that he would get a lawyer for the child, after the administration of *Miranda* warnings, would validate third-party invocation, we note that the Supreme Court of Vermont came to a contrary conclusion in *State v. Stanislaw*, 153 Vt. 517, 573 A.2d 286 (1990). In *Stanislaw*, after confirming that the right to counsel was personal to the suspect and not subject to third-party invocation (*Stanislaw*, 153 Vt. at 530, 573 A.2d at 294), the court determined that hearing a coworker's statement that a lawyer would be procured for him after the administration of *Miranda* warnings "only supports the conclusion that defendant validly waived his *Miranda* rights [since he thereby knew] an attorney was his for the asking" (*Stanislaw*, 153 Vt. at 531, 573 A.2d at 294). Moreover, as the Texas Court of Criminal Appeals observed, there is no reason to assume that a third party is validly reflecting a suspect's desires when he attempts to invoke counsel for the suspect. See *Kelly v. State*, 621 S.W.2d 176, 180 (Tex. Crim. App. 1981) ("We decline to equate an attempt by a member of the family of an accused to contact a lawyer *** with an indication by the accused that he desires consultation with counsel prior to any questioning. Appellant's mother may have acted on her own despite the indifference or even opposition of her son").

Other than by analogizing the facts of this case to those in the *Lee* case and urging us to follow its conclusions, defendant provides us with no other compelling reason why the general rule that a suspect must invoke the right to counsel himself should not apply to minors. In fact, in his reply brief, defendant explicitly rejects what would appear to be his most hopeful line of attack, stating "[a]lthough studies do indicate that juveniles do not have the same capacity as adults to understand and appreciate the *Miranda* warnings, [defendant] does not contend on appeal that he was incapable either of invoking or of knowingly and intelligently waiving the right to counsel." We note that in other respects, we have been loathe to create new standards and procedures surrounding the interrogation of juveniles. See *People v. McNeal*, 298 Ill. App. 3d 379, 391 (1998) ("There is nothing in the [Juvenile Court Act] which mandates that a parent or guardian be given an opportunity to speak with the minor before questioning or that the parent or guardian be present at the time the minor is questioned. Nor does the statute require that the minor be seen by a youth officer before questioning. Illinois courts have consistently rejected any *per se* rule which would require a minor be given such opportunity"); see also *Fare v. Michael C.*, 442 U.S. 707, 725, 61 L. Ed. 2d 197, 212, 99 S. Ct. 2560, 2572 (1979) ("[The] totality-of-the-

circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so"). This reluctant approach seems sound for, as other courts have recognized, not all juveniles are in need of any extra protection. See *United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1161 (7th Cir. 1981) ("In other words, some juveniles are capable of independently exercising their *Miranda* rights. [Citations.] *** [A]t the time of his arrest, for purposes of constitutional analysis, Riley certainly was no 'child,' although under state law he was a juvenile, albeit by a mere eight days. Riley *** had sufficient understanding of his right to counsel that it is reasonable not to construe his request [for a parent] as one for an attorney"); *People v. Riley*, 49 Ill. App. 3d 304, 310-11 (1977) ("Defendant, only a week away from his 17th birthday, was advised of his constitutional rights on at least three occasions while in custody of the Alsip police. Each time, he stated that he understood their significance. Following these admonitions, defendant gave his confession. *** The only conclusion which may be drawn from the evidence contained in this record is that if the defendant had desired the advice of an attorney, he would have asked for one"). We, therefore, decline to now create the rule permitting third-party invocations of counsel for minors that defendant seeks.

■ Defendant appears to make one other contention in support of the suppression of his confession, namely, that, even if his father did not invoke his right to counsel, the right was effectively invoked when he consulted with attorney Salerno. We would first note that this contention is undeveloped and unsupported with pertinent authority so that it is waived under Supreme Court Rule 341(e)(7). 188 Ill. 2d R. 341(e)(7). However, we would also note that there is authority to support that meeting with an attorney, without any indication from the suspect that he has retained counsel or is adopting the lawyer's advice to remain silent or to only answer questions with him or her present, does not amount to the invocation of the right to counsel. See *State v. Curtis*, 552 A.2d 530, 532 (Me. 1988) ("[the defendant's] statement that he was familiar with the *Miranda* warnings and that he had already spoken to his attorney was not a request for an attorney"); *People v. Grant*, 30 P.3d 667, 675 (Colo. App. 2000) ("the fact that a defendant executed a financial eligibility form and the fact that a defendant was interviewed by a member of the public defender's office does not constitute an unambiguous invocation of the right to counsel"); *Montelongo v. State*, 681 S.W.2d 47, 54 (Tex. Crim. App.

774

1984) ("The attorney testified that he had told appellant and the police officers that his advice was that she make no further statement, but we hold that, absent some reasonably clear indication from the accused of a wish to adopt such unsolicited advice or to seek further counsel rather than to continue interrogation, the protection against continued interrogation granted to an accused who affirmatively requests counsel pursuant to the rule of *Edwards* does not extend to an accused who receives unsolicited advice at an unrequested meeting with an attorney"); see also *Thompkins*, 121 Ill. 2d at 434 ("We cannot agree with defendant that 'his speaking with an attorney whom he wished to retain after having received the *Miranda* warnings' constituted the invocation of his fifth amendment right to counsel"); *Lamp*, 322 N.W.2d at 55. We turn now, then, to defendant's challenges to his sentence.

## II. Sentence Enhancement Challenge

■ Defendant challenges his sentence by contending that the imposition of the additional 25 years for "personally discharg[ing] a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement or death to another person," pursuant to section 5—8—1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(d)(iii) (West 2000)), violates due process. Defendant argues this is so because the sentence enhancement for discharge of a firearm in the process of a murder "does not bear a reasonable relationship to the public interest of punishing the risk that firearms pose to others when used during the commission of a crime." See *People v. Bradley*, 79 Ill. 2d 410, 417 (1980) (" 'the standard of a proper exercise of the police power [which would therefore satisfy due process] is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare.' [Citation.]"). Defendant further challenges the 25-year add-on by contending that it constitutes a double enhancement because it serves as "additional punishment for an element which is inherent in the offense itself, *i.e.*, causing death." See *People v. Thompson*, 354 Ill. App. 3d 579, 591-92 (2004) ("Double enhancement occurs when a single factor is used both as an element of the crime and as an aggravating factor justifying the imposition of a harsher sentence than may have otherwise been imposed"). Finally, defendant contends that the sentence enhancement violates the proportionate penalties clause of the Illinois Constitution because it "punishes the means used to commit murder more harshly than murder itself," citing to the case of *People v. Moss*, 206 Ill. 2d 503 (2003). All of these issues were recently

addressed and resolved by our supreme court in *People v. Sharpe*, 216 Ill. 2d 481, 839 N.E.2d 492 (2005), a case defendant did not bring to our attention. In light of its dispositive nature, we will quote from *Sharpe* at length.

We will begin with *Sharpe*'s due process analysis:

"[D]efendant argues that the 25-to-life enhancement violates due process because it punishes the threat of harm more severely than the harm itself. *** He cites *Bradley, Moss* and *Morgan*. [Also cited to by defendant in this case.]

Defendant has read into the authority upon which he relies a rule this court has never adopted. ***

[We are not] inclined now to conclude that due process places such tight constraints on the legislature's power to set criminal penalties that the legislature is forbidden from taking potential harm into account in enhancing the punishment for conduct which additionally causes actual harm. The legislature has determined that firearm use is a serious problem because of the real danger that such weapons can cause accidental lethal injury. In order to combat this problem the legislature has decided to impose a sentencing enhancement of 25 years to life when a perpetrator discharges a firearm during the commission of a serious felony and causes serious harm to another person by doing so. *** Unquestionably, the 15/20/25-to-life enhancements are reasonably designed to remedy the particular evil the legislature was targeting. We find no due process violation in the legislature's determination that the social ill being addressed merits the penalty imposed." *Sharpe*, 216 Ill. 2d at 530-32, 839 N.E.2d at 522-23.

Since our supreme court hereby rejected the identical due process argument that defendant makes, we will reject it as well.

Surrounding double enhancement, the *Sharpe* court observed: "We find no double-enhancement problem. We do agree with defendant that the degree of harm required to invoke the 25-to-life enhancement is inherent in the crime of murder, but we note that the enhancement requires that the harm be caused *by the firearm*." (Emphasis in original.) *Sharpe*, 216 Ill. 2d at 529, 839 N.E.2d at 521-22. See also *Thompson*, 354 Ill. App. 3d at 592 ("There is no double enhancement here. Firearm use is not inherent in the offense of first degree murder"). Again, as our supreme court explicitly rejected defendant's exact argument, we will do the same.

Finally, with respect to defendant's proportionate penalties challenge, we observe that defendant's reliance on *Moss* has become unavailing in the wake of *Sharpe*. In evaluating the additional penalties imposed for the commission of various crimes with firearms, *Moss*

evaluated the proportionality of penalties imposed for offenses with different elements. See *Sharpe*, 216 Ill. 2d at 515-16, 839 N.E.2d at 513-14 (explaining the approach of *Moss* in the process of placing it in the context of the historical development of proportionate penalties analysis). *Sharpe*, however, ended this type of analysis, which defendant would have us employ by comparing the penalties for first degree murder and the sentence enhancement. *Sharpe*, 216 Ill. 2d at 519, 839 N.E.2d at 515-16 ("we have concluded that cross-comparison analysis has proved to be nothing but problematic and unworkable, and that it needs to be abandoned. Those cases that used such an analysis to invalidate a penalty are overruled, and this court will no longer use the proportionate penalties clause to judge a penalty in relation to the penalty for an offense with different elements"). As we noted in our double-enhancement analysis, the elements of first degree murder and the sentencing enhancement provided by section 5—8—1(a)(1)(d)(iii) are not identical; the enhancement only applies with the discharge of a firearm. Therefore, defendant's proffered cross-comparison challenge must fail. It is worthy of mention that the *Sharpe* court did leave intact two other forms of proportionate penalties challenges. "A defendant may still argue that the penalty for a particular offense is too severe, and such a challenge will be judged under the familiar 'cruel or degrading' standard. Further, a defendant may still challenge a penalty on the basis that it is harsher than the penalty for a different offense that contains identical elements." *Sharpe*, 216 Ill. 2d at 521, 839 N.E.2d at 517. We need not address these grounds, however, since defendant does not advance them.

## III. DNA Extraction

We next address defendant's challenge to the constitutionality of section 5—4—3(a—5) of the Unified Code of Corrections (730 ILCS 5/5—4—3(a—5) (West 2004)) as an unreasonable search and seizure under the fourth amendment of the federal constitution.

Section 5—4—3(a—5) of the Code provides:

> "Any person who was otherwise convicted of or received a disposition of court supervision for any other offense under the Criminal Code of 1961 or who was found guilty or given supervision for such a violation under the Juvenile Court Act of 1987, may, regardless of the sentence imposed, be required by an order of the court to submit specimens of blood, saliva, or tissue to the Illinois Department of State Police in accordance with the provision of this Section." 730 ILCS 5/5—4—3(a—5) (West 2004).

Defendant asks us to find the search provided for to be unreasonable because it serves no special need aside from general law enforcement. In the alternative, he asks us to find that any special need presented

by the State is outweighed by defendant's privacy interests. Our supreme court has recently, directly addressed defendant's contentions in *People v. Garvin*, 219 Ill. 2d 104 (2006), and rejected his arguments. The *Garvin* court held that the "main purpose" for the collection of DNA was "to absolve innocents, identify the guilty, deter recidivism by identifying those at a high risk of reoffending, or bring closure to victims" which it found distinct from "traditional law enforcement practices designed to gather evidence in a particular case to solve a specific crime that ha[d] already been committed." *Garvin*, 219 Ill. 2d at 122. The *Garvin* court further held that, on balance, the special need of the State outweighed the privacy interests of its defendant both because of the minimal intrusion presented by a blood draw (*Garvin*, 219 Ill. 2d at 123) and because of the reduced privacy expectations of convicted felons (*Garvin*, 219 Ill. 2d at 123-24). Therefore, the circuit court's order requiring extraction and storage of defendant's DNA was lawful.

## IV. Mittimus

■ Defendant's last challenge is to his mittimus. He contends, and the State concedes, that, where he committed only one act and there was only one victim, he could only be convicted of one count of murder, rather than four, as it presently stands. We have the authority to correct the mittimus. See *People v. Thompson*, 354 Ill. App. 3d 579, 594 (2004). We therefore order the clerk of the circuit court to correct it, so that the mittimus only reflects one conviction for first degree murder, specifically for count V, which alleged that defendant intentionally killed Washington, in violation of section 9—1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(1) (West 2000)), through personally discharging a firearm.

Affirmed and mittimus corrected.

CAHILL, P.J., and BURKE, J., concur.